IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| PRECIOUS PERRY, | ) | |
| | ) | Case No. 4:13-cv-03013 |
| Plaintiff, | ) | |
| | ) | PLAINTIFF'S BRIEF |
| vs. | ) | IN OPPOSITION TO |
| | ) | DEFENDANT'S |
| LANCASTER COUNTY, | ) | MOTION FOR SUMMARY |
| NEBRASKA, | ) | JUDGMENT |
| | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

The Plaintiff brought her claims after needing to take FMLA leave for the care of her husband who was terminally ill with cancer at the time.  Plaintiff applied for and was initially granted FMLA leave to care for her husband.  After the Plaintiff was granted FMLA leave, her leave was then rescinded and was only partially granted as the Defendant determined was medically necessary despite having medical certification to the contrary.  Plaintiff then faced disciplinary action for utilizing the FMLA leave originally granted to her.

Immediately upon the Plaintiff's return from FMLA leave she began to face retaliation by her supervisors which increased and ultimately lead to disparate scrutiny of the Plaintiff.  Ultimately the Plaintiff was terminated for allegedly

committing an act that no other similarly situated individuals have been terminated

for, and that some don't even face disciplinary action for.  There is sufficient

evidence to support the Plaintiff's claims and therefore summary judgment is

improper in this case.

## FACTS

1. Defendant's statement of fact #1 is not disputed.

2. Defendant's statement of fact #2 is not disputed.

3. Defendant's statement of fact #3 is not disputed.

4. Defendant's statement of fact #4 is not disputed.

5. Defendant's statement of fact #5 is disputed.   Although Ms. Schindler had

    the technical authority to terminate the Plaintiff, the evidence cited does not

    support the claim that *only* Ms. Schindler had authority to impose discipline

    on YSC employees.  The evidence cited supports that Ms. Schindler did

    have authority and that the other individuals did not have the technical

    authority to sign the termination, but does not support that Ms. Schindler had

    the *only* authority.  Further, it is disputed that other individuals did not have

    authority to terminate individuals as Ms. Schindler only took action when

    she was made aware of it by other individuals.  (See SOF5c).  Those other

    individuals had the authority to choose which incidents to make Ms.

Schindler aware of, thereby exercising authority to terminate and discipline individuals via a "rubber stamp" by Ms. Schindler while excusing the behavior of other individuals.  (See SOF 39-40, 44).

    a.  Plaintiff's statement of fact #5a, Rezabek gave Ms. Schindler the information they relied on to fire Ms. Perry.  (Doc. 18-12, p. 8; 265:12-15, Doc. 18-60, p. 265:12-15).

    b.  Plaintiff's statement of fact #5b, Defendant concedes that Ms. Schindler never took disciplinary action regarding same or similar incidents to those for which the Plaintiff was terminated for because "the matter was never brought to her attention." (Doc. 19, p. 43).

    c.  Plaintiff's statement of fact #5c, Defendant concedes that "Unless the conduct was made known to Ms. Schindler, she was not in a position to impose discipline for it.  (Doc. 19, p. 29).

6.  Defendant's statement of fact #6 is not disputed that the Plaintiff did send an email requesting Leave without pay for those dates.  The Plaintiff requested Leave for up to six weeks, the Plaintiff's request states "I'm also requesting leave W/O if necessary intermittently times throughout my husband recovery period which the doctors states it may be up to six weeks". (Doc. 18-4).

    a. Plaintiff's statement of fact #6a, Plaintiff outlined the schedule or actual medical appointments as planned on that date.  Plaintiff outlined that procedures were scheduled to occur starting with "Mike is scheduled for surgery on 4/12/11 at UNMC in Omaha;  He will need to go to pre-op on Monday [4/11/11] at 0800." (Doc. 18-4).

7. Defendant's statement of fact #7 is disputed that the fourth sentence is a material fact. Further, Plaintiff would point out that the Defendant's own records contained in the FMLA history (Doc. 18-16, p. 2; sec. 8), cited are contradicted by other defendant records.  (Doc. 18-6, p.1).

    a. Plaintiff's statement of fact#7a, The Defendant granted Plaintiff's FMLA request on April 7, 2011, stating, "Beginning April 10, 2011, your leave from work will be counted against your twelve weeks of FMLA entitlement"  (Doc. 18-6, p. 1).

8. Defendant's statement of fact #8 is not disputed.[1]  It is disputed whether or not it is a material fact that the request was not discovered until Monday, April 11, 2011.   Further, Plaintiff moves to strike all references to Perry Depo. Ex. 1 (Doc. 18-3) as replete with hearsay evidence and lacking foundation for the statements made within.

---

[1] Def. Cites to Hood Affidavit ¶4, but ¶ 5 of that affidavit has the relevant portion.  (Doc. 18-57, p. 2), additionally, the actual document is evidence of this as well.  (Doc. 18-5).

    a. Plaintiff's statement of fact #8a, Plaintiff indicated to Ms. Schindler on April 7, 2011, "I will submit my leave forms for the time specified above today."  (Doc. 18-4).

    b. Plaintiff's statement of fact #8b, Ms. Schindler was aware of Plaintiff's April 7, 2011 communication on or before April 7, 2011, at 3:46 p.m. (Doc. 18-4).  The email communication appears to include a forwarding of the Plaintiff's email by Ms. Schindler to Ms. Hood that states "Doesn't this need FMLA or Family Sick?"  There is no indication of what time that was sent, but Ms. Hood then forwarded all of the correspondence to Ms. Hupp, stating "can you do an FMLA letter for this?"  Which Ms. Schindler signed on April 7, 2011.  (Doc. 18-6).

9. Defendant's statement of fact #9 is not disputed that the Plaintiff showed up for work and worked her regular shift.  It is disputed whether or not it is material that "She did not speak with a supervisor regarding her requested leave, or explain why she was there to work a shift for which she had requested leave."  The Defendant presents no evidence that anyone attempted to speak with the Plaintiff regarding this, nor that the Plaintiff had any obligation to speak with a supervisor regarding this.  There is further no evidence that once Ms. Hood because aware of the discrepancy between the

request for time off and the actual first day off that she or anyone attempted to discuss that with the Plaintiff. The evidence is that Ms. Hood just changed the request.  (Doc. 18-57, p. 2; Doc. 18-5).

    a. Plaintiff's statement of fact #9a, Plaintiff believes that there is a date off in her request (or something).  (Doc. 18-1, 23:14-24:1).  She testified, "the dates I requested may be off like a day or so.  I'm not sure.  I just remember that Ms. Schindler pointed out to me that my dates were incorrect or something.  It didn't correspond with my leave request,…so there may be some information that is not exactly the same as the leave request that I submitted."  (Doc. 18-1, 24:3-11).

10.  Defendant's statement of fact #10 is disputed. Plaintiff does not dispute that she contacted the facility after receiving several phone calls.  "Yeah, I called. I had several phone calls saying that I had no showed, no call, and I knew I had put in the leave for that day, and so I called and I kept – they sent me to a supervisor, but the supervisor was busy, and Tina picked up, and she said, "What can I do,"  and I explained to her what was going on, that I had put in for family medical leave but they said I was like not on the schedule or something and they had not gotten my leave… She might not have said she hadn't got the leave, but she said that I wasn't on the schedule or something, or I told her that, something like that. (Doc. 18-1, 42:16-43:6).  It is

immaterial whether Plaintiff had received confirmation that her leave request
had been approved as it had already been approved on April 7, 2011, by Ms.
Schindler, herself.  "Beginning April 10, 2011, your leave from work will be
counted against your twelve weeks of FMLA entitlement." (Doc. 18-6, p. 1).

11.  Defendant's statement of fact #11, is disputed that the admissible evidence
cited (Doc. 18-1, 44:21-45:1), states what the Defendant attempts to state it
does.  It is further disputed that whether or not she apprised anyone,
including Ms. Dingman of the change of plans to her husband's medical
situation.  It is not disputed that there were changes to the medical plan for
her husband that required coordination by the Plaintiff.  (See SOF 11a-f).

   a.  Plaintiff's statement of fact, #11a, the plaintiff was made aware of
   substantial changes to the plan she had previously submitted the
   request for regarding which procedure would be completed, but was
   aware that the need for leave would continue.

      "The problem was that at four-thirty or 4:15 on that Friday, I was
   called by the transplant people and said that they had found out that the
   pre-op – or not the pre-op, but the information they had from some
   procedure they did said that his liver would not regenerate, and so they
   were at the point of looking at transplant evaluation.

She says, Give me a few minutes.  I'll call you back and give you the schedule.  I want you all to come down there next week, starting on Monday, and go to transplant eval, and that will take four it days, and that was from eight to four from Monday through Thursday, I think she said, so she said – she called me back at like five or so, and she says, "I'm going to send you an itinerary of your schedule."  I said okay.

She said, "you should get it either tomorrow or Monday."  No. She said, you should get it – she said you should get it either, -- oh, gosh. What ended up happening was she had to fax over the itinerary because I didn't get it.  No.  She told me she had already – she had already mailed it to me and asked me if I had got it that day, and that was Friday, and I said no, I hadn't seen it, and she said, "Well, it's on its way."

And so what she did was she faxed it to me that evening around about six, so I had to go and pick it up, and so both of us were taken back, because we had just found out he was going to have that major surgery within that week and en to find out he wouldn't be able to have the surgery."  (Doc. 18-1, 46:17-48:1).

The itinerary provided a different schedule that what the Plaintiff had originally thought.  (Doc. 18-1, 49:6-9).

b.  Plaintiff's statement of fact #11b, Plaintiff spent Monday, April 11,
2011, coordinating the things she needed to do for her husband, (Doc.
18-1, 49:1-5).  "On Monday I was on the phone throughout the day
with the nurse corresponding with the schedule of what I needed to do
that day for the transplant evaluation."  (Doc. 18-1, 61:7-20).

c.  Plaintiff's statement of fact #11c, Plaintiff testified that she did not
work on April 11, 2011, " Because I had already taken the time off
and we were still dealing with his medical – the serious medical issue.
I was as well talking back and forth to the hospital about what we
need to do, how e needed to do it, and getting faxes and stuff, talking
to the nurses.  This was a last-minute change, and they were trying to
get us up on what was going on.  (Doc. 18-1, 49:22-50:6).

d.  Plaintiff's statement of fact #11d, Plaintiff testified,

"You know I'm not quite sure why she would have an objection or
questioning that without just asking me what was going on, because
when you're in a situation where someone's ill and I was his caregiver,
when someone's ill, you spend a good number of time getting
information to make sure that that individual gets what they need,
because at a point they're not able to do it, so that's why you're the
caregiver.

So to have questions regarding that situation – and, to me, all of it
is like trauma, so to be able to, one, digest that you're going though that
situation is a personal situation, but to try to pull together all that
information, all the medical information, everything that you need to do
and have it all lined up and make sure that you're where you're supposed
to be, that you have the combinations that you need and that you're
prepared at that particular time for the procedure, is – it's a lot.  (Doc. 18-
1, 55:23-56:20).

e.  Plaintiff's statement of fact #11e, Plaintiff did not have the ability to
coordinate the things for her husband and to work on April 11, 2011.
(Doc. 18-1, 56:22-6).

f.  Plaintiff's statement of fact #11f, during the Plaintiff's previous
experiences with FMLA leave, if there had been any problem
regarding the leave, she was allowed to care for the individual needing
care and sort out the identified issue afterward.  (Doc. 18-1, 57:9-
58:14).

12. Defendant's statement of fact #12 is disputed in part.  Plaintiff does not
dispute the first portion of the statement of fact regarding the medical
certification.  Plaintiff disputes the second portion of the statement of fact
regarding her husband's leave as immaterial Plaintiff moves to strike all

references to Perry Depo. Ex. 1 (Doc. 18-3) as replete with hearsay evidence and lacking foundation for the statements made within.

13.

    a. Plaintiff's statement of fact #12a, Defendant stated that Plaintiff's husband took leave on April 15, 2011, "for non-FMLA reasons to run personal errands, and to rest form all the medical tests he had taken the previous three days."  (Doc. 18-8, p.2).

    b. Plaintiff's statement of fact #12b, Plaintiff's husband had an extended amount of time that he would lose vacation time if he didn't take them as vacation days.  (Doc. 18-58, 84:18-25).

14.  Defendant's statement of fact #13 is disputed as it is not supported by admissible evidence[2].  Plaintiff does not dispute that she informed the duty supervisor upon her return to work that there had been changes from the original medical plan regarding her husband.  (Doc. 18-1, 65:4-11).

15. Defendant's statement of fact #14 is not disputed as to the fact that the content of the document summarized is accurately done so.  Plaintiff does

---

[2] Plaintiff moves to strike all references to Perry Depo. Ex. 1 (Doc. 18-3) as replete with hearsay evidence and lacking foundation for the statements made within.

dispute that the FMLA leave had not been approved for April 10 – 19.  (Doc.
18-6).  Plaintiff further disputes Ms. Schindler's decision that Plaintiff did
not qualify for FMLA leave on the dates listed and would move to strike it
from the factual section as it is legal opinion.

16.  Defendant's statement of fact #15 is disputed as it is not supported by
admissible evidence.[3]  It is not disputed that the Defendant issued a
disciplinary letter to the Plaintiff on that date and that a mitigation meeting
was scheduled.

17.  Defendant's statement of fact #16 is not disputed that the meeting occurred,
that the listed individuals attended, that the discipline was a written warning
which required the Plaintiff to adhere to the YSC attendance policy and to
review and sign the FMLA policy, that the Plaintiff did not lose any pay, or
that the Plaintiff requested additional FMLA leave.  It is disputed that the
Plaintiff did not suffer any direct adverse consequences. (See SOF 16 a, 32).

   a.  Plaintiff's statement of fact #16a, Plaintiff did not know if the warning
       had any effect, but the whole procedure and the whole incident had

_____

[3] Plaintiff moves to strike all references to Perry Depo. Ex. 1 (Doc. 18-3) as
replete with hearsay evidence and lacking foundation for the statements made
within.

outcome.  Plaintiff had incidents of harassment, some incidents of just

inappropriateness, inappropriate conduct from the administration and

from the supervisors and the team leaders.  (Doc. 18-1, 73:24-74:7).

18.  Defendant's statement of fact #17 is not disputed.

   a.  Plaintiff's statement of fact #17a, Plaintiff had never had issues with

       Rezabek prior to her discipline for taking qualifying FMLA leave in

       2011.  (Doc. 18-1, 79:6-22).

   b.  Plaintiff's statement of fact #17b, Plaintiff was targeted for discipline

       related to her taking too much sick time.  (Doc. 18-35, p. 43:22-44:6).

   c.  Plaintiff's statement of fact #17c, Plaintiff became the focus of inquiry

       and was treated differently than other people beginning in 2011.

       (Doc. 18-36: p. 34:22-25, 36:11-15).

   d.  Plaintiff's statement of fact #17d, Plaintiff began being paid attention

       to more than some of the other staff. (Doc. 18-37, p. 9:25-10:5).  The

       Defendant staff began checking up on her movement screens, her

       logging, stopping by the pod, calling her on the radio asking what she

       was doing and going into the control boot and aiming cameras at areas

       that she was working, like supervisors going in where she was.  (Doc.

       18-37, 10:6-13).

19. Defendant's statement of fact #18 is disputed to the extent that the factual incident is described as "allegedly." (See SOF 18a).

    a. Plaintiff's statement of fact #18a, Teresa Wymore observed that a supervisor had gone through the Plaintiff's personal belongings in the break room and had put them in the garbage. (Doc. 18-36, p. 36:22-37:3).

20. Defendant's statement of fact #19 is not disputed that the factual allegation took place. Plaintiff believes that the characterization of "the remaining allegations" is inappropriate and not supported by evidence.

    a. Plaintiff's statement of fact #19a, Wymore could personally hear the harsh tone that was being used over the radio to the Plaintiff. (Doc. 18-36, p. 36:18-21).

21. Defendant's statement of fact #20 is not disputed that Timmerman inappropriately confronted Plaintiff in front of a detainee.

On this occasion, Plaintiff was told during the shift briefing that they should allow their escorts to relieve them for breaks or first breaks. Plaintiff contacted her escort and asked her to relieve her for break.

The escort was doing checks on another female in another pod and asked her to just lock down the kids. Plaintiff did and had a 15-minute

break.  The escort asked the Plaintiff to do a check on a young lady in E-pod
on her way back from break.

Plaintiff did the check on the young lady and the young lady decided
that she wanted to come out, so Plaintiff was bringing her out and called
control for clearance.  When Plaintiff walked out the door, Timmerman
confronted the Plaintiff accusing her of being on break when it was obvious
that the Plaintiff was not because she was escorting a youth at the time.  He
berated the Plaintiff.

The youth became upset and Plaintiff had to advise her not to say
anything and Timmerman berated the Plaintiff while they walked down the
hall with the youth.  (Doc. 18-1, p. 95:10-19).

a. Plaintiff's statement of fact #20a, after the incident with the family
   medical, Timerman turned up the pressure, attacking the Plaintiff and
   verbalizing negative comments in front of kids and picking on certain
   things that he would say and do that were not true, like he was trying
   to get the Plaintiff to be upset or agitated by his behavior.  (Doc. 18-1,
   p. 94:11-20).

b. Plaintiff's statement of fact #20b, Timmerman's behavior got worse
   following the Plaintiff taking FMLA leave in 2011.  (Doc. 18-1, p.
   94:21-95:1).

c. Plaintiff's statement of fact #20c, Plaintiff complained to Rezabek about Timmerman and got no response. "I didn't get anything. He said he'd take care of it and talk to him." (Doc. 18-58, p. 71: 3-10).

d. Plaintiff's statement of fact #20d, Ms. Schindler asked Mr. Rezabek about the Plaintiff's complaints regarding Mr. Timmerman and Mr. Rezabek indicated that he did not talk to Mr. Timmerman about the complaints, that he "didn't know that this was that significant of an event." (Doc. 18-60, p. 301:6-23).

e. Plaintiff's statement of fact #20e, other employees also were also gone on their breaks too long but were not confronted in front of detainees. (Doc. 18-35, p.30:1-9).

22. Defendant's statement of fact #21 is disputed. Timmerman and Rezabek to actually impose discipline upon the Plaintiff as they had sole discretion to inform Schindler when they felt a disciplinary action was warranted and to conceal when an infraction had occurred that they did not want an individual disciplined for. (See. SOF5, 5a, 5b, 5c).

23. Defendant's statement of fact #22 is disputed that the matter for implementing the checks in practice was as it is set out in the written policy. (See SOF 22a-).

a. Plaintiff's statement of fact #22a, The standard would be to do Fifteen-minute checks, either written, on a written form, or in the form of a Morse Watchman when they're in their rooms. (Doc. 18-35, p.9:19-23) Sometimes, the Morse Watchman break down. Whenever they're not working, a paper check is performed. We do 15 –minute paper checks in writing on all of our residents. (Doc. 18-35, p.10:2-11).

b. Plaintiff's statement of fact #22b, between 2006 and the Plaintiff's termination, there have been times when the staff has had to monitor more rigidly, and then there's times when it's been more lax. The Morse Watchman probes are downloaded to a computer, and the night-shift supervisors monitor them, just making sure, going back over the previous two shifts, that everybody's made their checks accordingly. (Doc. 18-36, p.18:24-19:3; Doc. 18-35, p.10:21-11:3).

c. Plaintiff's statement of fact #22c, Prior to the Plaintiff's termination, the night-shift supervisors were only downloading the probes randomly. They weren't doing every single pod every single day. They were just picking pods at random to do at night. (Doc. 18-37, p.21:2-8).

24. Defendant's statement of fact #23 is not disputed.

    a.  Plaintiff's statement of fact #23a, the facility was short of staff on

       January 5, 2012.  (Doc. 18-58, p. 24:18-22).

25.  Defendant's statement of fact #24 is disputed as it is not supported by

admissible evidence.  The plaintiff' moves to strike all references to

"Thompson aff. Ex. 1 (Doc. 18-55, p. 4-6), it is based entirely on hearsay

evidence, and Ms. Thompson has no firsthand knowledge of the information

contained in the exhibit.

    a.  Plaintiff's statement of fact#24a, typically an inquiry about checks

       occurs when the overnight supervisor notices a problem in the reports,

       they forward that to the shift supervisor that was working that day.

       (Doc.  18-59, p. 171:19-173:18).

    b.  Plaintiff's statement of fact #24b, typically the supervisor does not

       immediately take the issue o Annette or to Michelle.  (Doc. 18-59, p.

       173:12-15).

26.  Defendant's statement of fact #25 is disputed in part. (See SOF 31a-c).

The plaintiff' moves to strike all references to "Thompson aff. Ex. 1 (Doc.

18-55, p. 4-6), it is based entirely on hearsay evidence, and Ms. Thompson

has no firsthand knowledge of the information contained in the exhibit.

27.  Defendant's statement of fact #26 is disputed.   Timmerman kind of

mentioned what he was looking into to Thompson, but didn't have a whole

lot of time to discuss it as he was quickly moving by her office.  (Doc. 18-59, p. 140:13-24).  The plaintiff' moves to strike all references to "Thompson aff. Ex. 1 (Doc. 18-55, p. 4-6), it is based entirely on hearsay evidence, and Ms. Thompson has no firsthand knowledge of the information contained in the exhibit.

28.  Defendant's statement of fact #27 is not disputed. (See SOF 31a-c).

    a.  Plaintiff's statement of fact #27a, Plaintiff was not provided a union waver during this meeting even though her comments in that discussion were used in the justification for termination.  (Doc. 18-59, p. 156:2-19).

    b.  Plaintiff's statement of fact #27b, Plaintiff asked if she was going to be subjected to punishment and if she needed union representation. She was told that she could not have union representation in the meeting.  (Doc. 18-2, p. 179:22-180:6).

29.  Defendant's statement of fact #28 is disputed.  (See SOF 31a-c, Doc. 18-30).

30.  Defendant's statement of fact #29 is not disputed that the letter to propose termination was sent to the Plaintiff and that a pre-termination meeting was scheduled.  Plaintiff does not have sufficient evidence to know MS. Schindler's thought process.

31.  Defendant's statement of fact #30 is not disputed.

32.  Defendant's statement of fact #31 is not disputed.

    a.  Plaintiff's statement of fact #31a, Plaintiff did not tell Rezabek about the check sheet at the time they met because she didn't know what day he was talking about.  He had the dates wrong from the computer. (Doc. 18-58, p. 62:5-10; Doc. 18-59, 135:9-14).

    b.  Plaintiff's statement of fact #31b, At the time the Plaintiff created the document, she put Ex 7 in the drawer of the pod desk at the time.  Did not notify a supervisor at that time as there was not consistent policy of what to do with those sheets. (Doc. 18-58, p. 53:23-54:5).

    c.  Plaintiff's statement of fact #31c, Plaintiff first supplied the document when she was asked to bring evidence to the pre-disciplinary meeting. (Doc. 18-58, p. 55:18-20).

33.  Defendant's statement of fact #32 is not disputed that those were Schindler's actions and opinions.  Plaintiff does not agree with Ms. Schindler's opinion.

34.  Defendant's statement of fact #33 is not disputed.

35.  Defendant's statement of fact #34 is not disputed.

36. Plaintiff's statement of fact #35, There are times when people have missed checks.  (Doc. 18-35, p.11:4-12)  There isn't any employee hasn't missed a

check at one time or another in their career here on a 15-minute check. Darwin Anderson has observed my coworkers missing checks.  (Doc. 18-35, p.11:16-20).

37. Plaintiff's statement of fact #36, no other employees have been terminated for missing checks.  (Doc. 18-35, p.16:2-14; Doc. 18-36, p.20:19-21; Doc. 18-37, p.20:2-4).  There have times when checks were missed, but supervisors weren't coming to individuals and saying, hey, we found out through the Morse Watchman that you didn't do this.  (Doc. 18-35, p.17:24 – 18:11).

38. Plaintiff's statement of fact #37, Darwin Anderson has missed checks.  (Doc. 18-35, p.11:14). Anderson received a verbal written warning for missing checks. (Doc. 18-35, p.13:18-21).

39.  Plaintiff's statement of fact #38, typically an individual would receive a verbal or written warning (Doc. 18-37, p.20:20 – 21:1; Doc. 18-36, p.16:1-3)., the supervisor just asked you about it, and/or Ms. Johanna Machmer, the training coordinator.   Only when a counselor has deemed that a detainee needs to be on a documented check, does an individual automatically get a written warning for missing checks.  (Doc. 18-37, p.9:9-20; p.20:5-11).

40. Plaintiff's statement of fact #39, Approximately 6 months after the Plaintiff had been terminated, There was a Sunday when Mr. Monroe was working

here, was working Charlie Pod.  He took his kids to breakfast, came back.
The probe wasn't working in that pod.  He locked the doors, locked the kids
down, and then he went about going around the building doing other things
and didn't get back to his kids till lunchtime.  (Doc. 18-35, p.22:6-23:8;
p.25:13-15).

41. Plaintiff's statement of fact #40, Anderson complained to Rezabek about Mr.
Monroe leaving his kids unattended from 8:30a.m. until 11:00 a.m..
Rezabek did not do anything so Anderson complained to Timmerman about
it as well.  (Doc. 18-35, p.24:4-22)  Monroe faced no formal disciplinary
action for not checking his kids for hours.  (Doc. 18-50).

42. Plaintiff's statement of fact #41, Anderson was mostly a co-worker of the
Plaintiff, but was a temporary supervisor for four months (Doc. 18-35,
p.6:11-7:17). He had an opportunity to observe the Plaintiff's work both as a
co-worker and supervisor (Doc. 18-35, p.7:24-8:2).  She adequately
performed the duties that were required of her as a juvenile detention officer.
(Doc. 18-35, p.8:3-6).  Wymore also had an opportunity to observe the
Plaintiff's work and she always performed adequately.  (Doc. 18-36,
p.38:20-39:3).

43.  Plaintiff's statement of fact #42, Anderson believed that the Plaintiff's medical leave called attention to her and that she was called out on things because of that.  (Doc. 18-35, p.43:22-44:6).

44. Plaintiff's statement of fact #43, there were times when there were more than one door open at a time.  (Doc. 18-35, p.32:15-20).  The way it's supposed to be and the way it is actually done varies from shift to shift, from supervisor to supervisor. (Doc. 18-35, p.33:21- 34:1).

45. Plaintiff's statement of fact #44, August 3, 2012, Wymore wrote a memo to Schell Schindler and Annette Thompson outlining that she was aware that C. Schmidt missed checks on a youth from approximately 8:30 a.m. until 10:22 a.m. and that she reported the missed checks to Timmerman.  (Doc. 18-36, Ex. 2).   Mr. Schmidt received no formal discipline for the missed checks.  (Doc. 18-52).

46.  Plaintiff's statement of fact #46, on March 23, 2012, Thomas Gandra received a reprimand for violation of key and lock control policy and movement policy – not securing doors properly.  And on March 21, 2013, he received a written warning for missed security checks.  (Doc. 18-46).

47.  Plaintiff's statement of fact #47, on November 21, 2011, Matthew Lollman was only given a written reprimand for securing doors.  On April 15, 2012, he was given a written warning for missed security checks.  (Doc. 18-49).

48.  Plaintiff's statement of fact #48, on July 9, 2012, Kenneth Nolan was given a written warning for missed security checks.  (Doc. 18-51).

## Argument

## I.  There are genuine issues of material fact therefore the Defendant is not entitled to summary judgment as a matter of law.

The question before the district court is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); see, e.g. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Morgan v. Rabun*, 128 F.3d 694, 696 (8th Cir. 1997), *cert. denied*, 523 U.S. 1124 (1998).

Summary judgment is an extreme and treacherous device, which should not be granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy, and unless the other party is not entitled to recover under any discernible circumstances. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) *disapproved on other grounds*.  In ruling on a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion and give that party the

benefit of all reasonable inferences to be drawn from the record. *Id.*; *Widoe v. District No. 111 Otoe County Sch.,* 147 F.3d 726, 728 (8th Cir. 1998); *Ghane v. West*, 148 F.3d 979, 981 (8th Cir. 1998).  Even if the district court is convinced that the moving party is entitled to judgment, the exercise of sound judicial discretion may dictate that the motion should be denied, so the case may be fully developed at trial. *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979); *Franklin v. Lockhart*, 769 F.2d 509, 510 (8th Cir. 1985).

Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251-52.   A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252.  The court's role is simply to determine whether the evidence in the case presents a sufficient dispute to place before the jury.

"At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. Rather, the court's function is to determine whether a dispute about a material fact is genuine.  If reasonable minds could differ as to the import of the evidence, summary judgment is inappropriate." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372,

1376-77 (8th Cir. 1996) (internal citations omitted). See also *Bell v. Conopco, Inc.,* 186 F.3d 1099, 1101 (8th Cir. 1999) (court's function is not to weigh the evidence to determine truth of any factual issue; abrogated in part on other grounds).

## II. **There are genuine issues of material fact regarding the Plaintiff's FMLA claims therefore the motion for summary judgment must be dismissed.**

29 U.S.C. §2615(a) outlines acts prohibited under the FMLA.  It is unlawful to:

- (1)  Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [29 USCS §§ 2611 et seq.].

- (2)  Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title [29 USCS §§ 2611 et seq.].

    29 SCS § 2615.

    In this case, the Defendants did both.  The Defendant unlawfully denied the Plaintiff FMLA leave for time which she was qualified, and then disciplined the Plaintiff for using time that had been designated FMLA qualifying leave. Following the Plaintiff's use of FMLA time, the Plaintiff began to face immediate and disparate scrutiny from her supervisors that ultimately led to her termination

for allegedly committing the same act that no other individuals have been terminated for.

Interference

The Plaintiff satisfies the burden set forth in *Stalling v. Hussman Corp*. 447 F.3d 1041, 1050 (8th Cir. 2006), that "an employee must show only that he or she was entitled to the benefit denied." In the present case, the Plaintiff was qualified for the FMLA leave she requested. The Plaintiff was initially granted the leave requested. "Beginning April 10, 2011, your leave from work will be counted against your twelve weeks of FMLA entitlement" (Doc. 18-6, p. 1). The Plaintiff then provided the necessary medical certification as required therefore the leave should have been approved in its entirety and the Plaintiff should have to have been subjected to the discipline she was regarding her FMLA leave.

That was not the end of the inquiry. The county violated the FMLA in denying the Plaintiff the leave that she was qualified for, and in not following the provisions set forth to challenge the medical certification if they did not believe it to be accurate. The Defendant attempts to argue that the Plaintiff was not qualified for FMLA leave on the days when her husband was not actively receiving treatment. The Department of Labor has clearly defined that this is not the case though.

29 C.F.R. § 825.124 Needed to care for a family member or covered servicemember.

(a) The medical certification provision that an employee is needed to care for a family member or covered servicemember encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

(b) The term also includes situations where the employee may be needed to substitute for others who normally care for the family member or covered servicemember, or to make arrangements for changes in care, such as transfer to a nursing home. The employee need not be the only individual or family member available to care for the family member or covered servicemember.

The Defendant explicitly admits that Schindler "reasoned that because plaintiff's spouse received no care on either of those dates, plaintiff did not

"care for" him on those days" (Doc. 19, p. 36).  That Schindler interpreted the law one way is immaterial when the DOL has interpreted the Plaintiff's actions to be covered by the FMLA.  As thoroughly detailed above in the factual section, the Plaintiff was incapable of making the necessary arrangements and working on April 11, 2011.  (See SOF 11a-f).  It is immaterial whether or not the Plaintiff explained why she needed to make the arrangements on Monday as opposed to over the weekend when she was shuffled to Dingman because no supervisors were available when she called in.

Secondly, had the Defendant believed that the medical certification provided by the Plaintiff was insufficient to support her request for FMLA leave, the law provides for the Defendant to obtain a second medical opinion.  The language of § 2613(c)(1), however, is merely permissive: It states that an employer with "reason to doubt the validity" of the employee's certification "may" require the employee to obtain the opinion of a second health care provider.  *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860 (8th Cir. 2000).  As the Defendant was presented with a valid medical certification, which they did not dispute or challenge, they even accepted it for granting the Plaintiff's FMLA request in part, the certification provided was valid and the Plaintiff was entitled to FMLA leave.  Instead, based on Ms. Schindler's incorrect attempt at interpreting the law, despite the DOL doing

so contrary to her opinion, the Plaintiff was wrongfully deprived the FMLA coverage she was entitled to.  The Plaintiff's interference claim survives and is not appropriate for summary judgment.

The Defendant also attempts to argue that Schindler was in her authority to deny the Plaintiff's FMLA leave and to comply with the regular attendance requirements citing 29 C.F.R. § 825.302(d).  This argument fails for two reasons. 1) The Plaintiff was required to notify Schindler of her absence, which Schindler approved on April 7, 2011, and 2) that provision applies only absent unusual circumstances.

Schindler approved the Plaintiff's leave request on April 7, 2011 with regards to the FMLA and was explicitly aware at the time of the FMLA request that the Plaintiff needed those dates off.  That Schindler didn't find the leave request form until April 11, 2011, is immaterial since she was explicitly aware of the leave request and had already approved the leave days earlier.

That the Plaintiff's husband had a significant change in his medical plan that required the exigency of the Plaintiff's leave (which was approved) and significant re-coordination of the treatment arrangements necessary is certainly an unusual circumstance that would remove Schindler's authority to deny the Plaintiff's leave for April 11 because Schindler had not seen the leave form she had already been

notified of by the Plaintiff.  The Defendant simply cannot have it two ways.
Schindler cannot have both approved and not approved of the Plaintiff's leave on
April 7, 2011.  The undisputed evidence is that the leave was granted on April 7,
2011. (Doc. 18-6, p. 1).

Lastly, the Defendant argues that the Plaintiff had not been prejudiced by the
violation.  The Plaintiff was formally disciplined for taking qualifying FMLA leave
(Doc. 18-44), and was subsequently terminated later that year.  There is additional
evidence that the Plaintiff was targeted for termination based on her leave.  (See
SOF 17a-d).   There is certainly sufficient evidence that a jury could conclude that
the Plaintiff's leave and/or denial of leave led to the Plaintiff's termination.

<u>Retaliation</u>

The Plaintiff not only suffered interference with her FMLA rights, but was
retaliated against for taking the FMLA time she was entitled to and/or approved
for.  The Eighth Circuit has analyzed retaliation claims requiring that "the first step
in analyzing a FMLA retaliation claim is determining whether a plaintiff has made
a prima facie showing of retaliation. At this step, a plaintiff must show that she
exercised rights afforded by the FMLA, that she suffered an adverse employment
action, and that there was a causal connection between her exercise of rights and
the adverse employment action. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832

(8th Cir. 2002) (citing Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002))." In the present case it is not disputed that the Plaintiff qualified for at least some FMLA qualifying leave. The Plaintiff additionally suffered an adverse employment action, both in her disciplinary action regarding her FMLA leave, but also in the subsequent termination months later. There is further evidence that the Plaintiff began to face increased scrutiny immediately following her request for leave. (See SOF 17a-d, 18, 18a, 19, 19a, 20, 20a-e). Ultimately, the Plaintiff was terminated for something that no other individuals were terminated for. (See SOF 35-38, SOF 46-48). There is sufficient evidence that a finder of fact could conclude that the Plaintiff had been retaliated against for utilizing the benefits available through the FMLA. Summary judgment is improper.

Pretext

Under the *McDonnell-Douglas* burden shifting framework, once the plaintiff proves her *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant successfully does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered legitimate reason is merely a pretext for unlawful discrimination. *Id.*

A pretext, in employment law, is a reason that the employer offers for the action claimed to be discriminatory, that the court disbelieves, allowing an

inference that the employer is trying to conceal a discriminatory reason for his

action. *Ryther v. Kare 11*, 108 F.3d 832 (8th Cir. 1997). Pretext evidence "must

call into question the veracity of the defendant's ultimate justification." *Ryther*,

108 F.3d 832, quoting *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d

436, 444 (11th Cir. 1996) (disapproved on other grounds) see also *Anderson v.*

*Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994) (a plaintiff must

"produce evidence from which a rational fact finder could infer that the company

lied"), see also *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711,

716 (1983) ("sensitive and difficult" issues of intentional discrimination will

frequently be proven by circumstantial evidence of pretext, as "[t]here will seldom

be 'eyewitness' testimony as to the employer's mental processes"); *Id.* at 714 n.3;

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)(The

*McDonnell Douglas* formula does not require direct proof of discrimination.").

Regarding this stage in the summary judgment proceedings, the Eighth

Circuit held the following:

> The focus of inquiry at the summary judgment stage
>
> "always remains on the ultimate question of law: whether
>
> the evidence is sufficient to create a genuine issue of fact
>
> as to whether the employer intentionally discriminated
>
> against the plaintiff because of [the protected

characteristic]." This approach "is consistent with the

Supreme Court's . . decision in *St. Mary's Honor Ctr. v.*

*Hicks*, where the Supreme Court held that a plaintiff's

proof of pretext is relevant to, but not dispositive of, the

ultimate issue of intentional discrimination."

*Strate,* 398 F.3d at 1018 (quotations in original; internal citations omitted).

The Plaintiff was ultimately terminated for something which no other individuals have been terminated for.  (See SOF 35-38).  At least twice since the Plaintiff's termination two individuals have been complained of doing the same or similar things the Plaintiff was terminated for and faced no disciplinary action for it at all.  In both of those instances, complaints were made to the same two supervisors who initiated the disciplinary action against the Plaintiff.  See SOF 39-40, 44).

In the present case, the Plaintiff engaged in protected activity and was harassed and subsequently terminated as a result.  There is evidence that the Plaintiff was being paid attention to more than other individuals, and even evidence that it may have been specifically because of her leave.  (See SOF 17a-d).  There is further evidence, submitted by the Defendant that there was a pattern of

retaliating against individuals for their participation in proceedings like those that the Plaintiff was involved in.

Ms. Emms Wood testified at her deposition that she feared she would be retaliated against just for providing deposition testimony in this case, and that she's been a target at the detention center before. (Doc. 18-37, p.16:19-25). Ms. Wymore also testified that she has faced and feared for more retaliation in her job. Ms. Wymore made a complaint regarding Mr. Timmerman physically violently shoving Ms. Wymore. Since that complaint, Ms. Wymore's job has become increasingly difficult. (Doc. 18-36, p.32:12-33:14). Ms. Wymore has not come under increasing scrutiny. (Doc. 18-36, p.34:14-21). Mr. Anderson additionally witnessed individuals who seem to be targeted. There is sufficient evidence that a reasonable jury could conclude that the reason given for the plaintiff's termination was a pretext to discriminate and/or retaliate against the Plaintiff. Summary judgment should be overruled.

<u>Cats Paw</u>

The Defendant also attempts to excuse the Plaintiff's termination by pointing to the fact that Ms. Schindler had the technical authority to terminate the Plaintiff and that Rezabek and Timmerman did not have the technical authority to discipline the Plaintiff. This argument fails as Schindler admits that she only became aware

of any of his because the supervisors brought it to her attention, and that she was not aware of other incidents and could not impose discipline for them without being made aware of them.  (See SOF 5, 5a-c).

Schindler was merely a rubber stamp or unwitting "cat's paw" for Rezabek and Timmerman's unlawful motive.  In the Eighth Circuit, the rule provides that an employer cannot shield itself from allegations of unlawful discrimination by using a purportedly independent person as the decision maker where the decision maker merely serves as the conduit, or vehicle, or rubberstamp by which another achieves his or her unlawful design.  *Ludlow v. BNSF Ry.,* 2013 U.S. Dist. LEXIS 104234 (D. Neb. July 24, 2013).  The employer can be liable if the decision-maker relies on facts that have been "filtered by a manager determined to purge the labor force of women"  *Quamhiyah v. Iowa State Univ. of Sci. & Tech.,* 566 F.3d 733, 742 (8th Cir. 2009) quoting *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1323 (8th Cir. 1994).

In the present case, it is undisputed that Schindler did not exercise her authority unless she was made aware of an issue, (SOF 5c), and never took any action for same or similar incidents because they were never brought to her attention.  (SOF 5b).  Mr. Rezabek (and Timmerman) gave Schindler the information that was relied upon to terminate the Plaintiff.  (SOF 5a).  Additionally, there is evidence that Schindler and Timmerman even had received

complaints of same or similar conduct to the Plaintiffs, and did nothing regarding the complaints. (See SOF 39-40, 44). A reasonable jury could conclude that Rezabek and Timmerman had the authority to determine which infractions faced disciplinary action, and which were brushed under the rug. Unfortunately for the Plaintiff, Timmerman and Rezabek used their authority to be certain that Schindler was aware of the Plaintiff's alleged conduct while allowing similar conduct to slide from other individuals.

III.   **There are genuine issues of material fact regarding the Plaintiff's racial discrimination claims therefore the motion for summary judgment must be dismissed.**

Hostile Environment

The Defendant incorrectly sets forth what is required to establish a prima facie case for a hostile work environment claim based on sexual harassment.

To set forth a prima facie case of a hostile work environment, Anderson must demonstrate "(1) that [she] is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition or privilege of her employment." *Henthorn*

*v. Capitol Commc'ns, Inc.,* 359 F.3d 1021, 1026 (8th Cir. 2004) (citing

*Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 933 (8th Cir. 2002)).

*Anderson v. Family Dollar Stores of Ark., Inc*., 579 F.3d 858, 862 (8th Cir. Ark.

2009). The five element standard set forth by the Defendant, is that which is used

when a plaintiff has been harassed by a nonsupervisor. *Carter v. Chrysler Corp*.,

173 F.3d 693, 700 (8th Cir. 1999), *Sheriff v. Midwest Health Partners, P.C*., 619

F.3d 923, 929 (8th Cir. 2010). The fifth element, "(5) that the employer knew or

should have known of the harassment and failed to take prompt remedial action.

Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. [538] 1999); Pfeil v. Intecom

Telecomms., 90 F. Supp. 2d 742, 748 (N.D. Tex. 2000)." Is rooted in the Ellerth

Faragher Affirmative Defense. **Burlington Industries, Inc. v. Ellerth** 524 U.S.

742 (1998), <u>Faragher v. Boca Raton,</u> 524 U.S  2275 (1998).  "In Faragher and

Ellerth, the Supreme Court modified this test with respect to cases where the

alleged harasser is a supervisor with immediate or higher authority over the

harassed employee. Watts, 170 F.3d at 509; Pfeil, 90 F.Supp.2d at 748. In such

cases, the employee need only meet the first four elements of the test." *Walker v.*

*SBC Servs.,* 375 F. Supp. 2d 524, 537-538 (N.D. Tex. 2005) (internal citations

omitted).

The Defendant seemingly concedes that the first element have been met and

only argues that the second through inapplicable fifth elements have not been

satisfied.  It is undisputed that the Plaintiff was subjected to different terms of

employment than other similarly situated individuals.  The Plaintiff was yelled at,

berated over the intercom system, had her personal belongings thrown away and

was placed under a microscope and scrutinized ultimately to her termination.  The

Plaintiff certainly felt that it was because of her race, and as the evidence shows,

she was treated in a vastly disparate manner to those who were not of her race who

were committing the same or similar conduct she was accused of with little or no

disciplinary action being taken against them.  Even more troubling, this treatment

was noticed by at least three of her co-workers who have testified in this case.

These are unbiased individuals who believed that the conduct was notable.  That

Ms. Ems Wood did not admit that the Plaintiff may have been treated differently

because of her race is not dispositive, as there is evidence that Ms. Ems Wood

feared retaliation just for giving her testimony and may not have felt free to fully

divulge the reasoning why she believed the Plaintiff to be treated differently.

Ultimately, there are genuine issues of material fact that should be left to a jury to

decide therefore summary judgment is improper and should be denied.


<u>Termination</u>

The Defendant misguides the court in attempting to argue that because they

believed the termination to be necessary, that it was not in violation of the law.  As

evidence above, the Plaintiff has produced sufficient evidence to show that no

other individuals were terminated for missing checks and/or door violations.

Further, the Plaintiff has presented evidence that other individuals who have

committed similar infractions to those that the Plaintiff was accused of have faced

reprimand and written warning if any disciplinary action at all.  (See SOF 35-38,

SOF 46-48).  The Defendant's opinion of whether or not the Plaintiff's termination

was necessary is not plausible given the evidence that only the Plaintiff was treated

in that manner.

> When a plaintiff produces evidence sufficient to raise an inference that an
>
> employer applied its legitimate employment expectations in a disparate
>
> manner (i.e., applied expectations to similarly situated male and younger
>
> employees in a more favorable manner), the second and fourth prongs of
>
> McDonnell Douglas merge--allowing the plaintiff to establish a prima facie
>
> case, stave off summary judgment for the time being, and proceed to the
>
> pretext inquiry. See, e.g., Curry v. Menard, 270 F.3d 473, 478 (7th Cir.
>
> 2001); Gordon v. United Airlines, Inc., 246 F.3d 878, 886-87 (7th Cir.
>
> 2001); Oest v. Illinois Dept. of Corr., 240 F.3d 605, 612 n.3 (7th Cir. 2001);
>
> Flores v. Preferred Tech. Group, 182 F.3d 512, 515 (7th Cir. 1999); Coco,
>
> 128 F.3d at 1180.

Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329, (7th Cir. Ill. 2002).

Similarly, the Plaintiff has presented sufficient evidence to shift the burden.  As

addressed fully above, the Plaintiff has presented sufficient evidence of pretext.

Lastly, the Defendant places a mistaken reliance on the personnel board's decision

to uphold the Plaintiff's termination as evidence that the termination was not in

violation of any law.  However, the personnel board, which admittedly is not made

up entirely of lawyers is not tasked with determining whether or not Title VII or

NFEPA were violated, but whether or not the policies of the county were violated

in the termination of the Plaintiff.  That determination in no way supports any

finding that the Plaintiff was not terminated because of her race.

IV.   **There are genuine issues of material fact regarding the Plaintiff's ADA claim therefore the motion for summary judgment must be dismissed.**

   The elements of the Plaintiff's ADA claim again are as follows, she must

prove that  (1) she was a member of a protected group; (2) she was qualified to

perform the essential functions of the position; and (3) she was treated differently

under circumstances giving rise to an inference of unlawful discrimination.  See

*Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 706 (8th Cir.2002) citing *Greer v.*

*Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir.1999); See also *Bergstrom-EK v.*

*Best Oil Co.,* 153 F. 3d 851, 857 (8th Cir. 1998).  "The proof necessary for

discrimination cases is flexible and varies with the facts of each case."  *Heaser*,

247 F.3d 826, 830, citing *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998).

The Plaintiff was a member of a protected group.  "Title II of the ADA [986]  protects individuals "who are discriminated against because of their relationship or association with individuals who have a known disability." Doe v. County of Centre, 242 F.3d 437, 447 (3d Cir. 2001) (citing 28 C.F.R. 35.130(g)); see also MX Group, Inc. v. City of Covington, 293 F.3d. 326, 332-35 (6th Cir. 2002) (association discrimination claims available under section 504). Such a relationship or association must be known by the public entity that engaged in the alleged discrimination. See Schneider v. County of Will, 190 F. Supp. 2d 1082, 1089 (N.D. Ill. 2002)."  *Bahl v. County of Ramsey*, 597 F. Supp. 2d 981, 985-986 (D. Minn. 2009).  The Plaintiff was discriminated against because of her association with her husband who ultimately died as a result of his serious health condition that did in fact limit his ability to work.  There is additional evidence that the Plaintiff's work performance was satisfactory.  (See SOF 41).  It is not disputed that the Plaintiff was treated differently than individuals who were not associated with a disabled individual.  (SOF 36-40, 42-48).  As fully addressed above, there is sufficient evidence that a fact finder could conclude the Defendant's articulated reason for terminating the Plaintiff to be a pretext and therefore summary judgment must be overruled.

I. **There are genuine issues of material fact regarding the Plaintiff's ADA claim therefore the motion for summary judgment must be dismissed.**

The Defendant bizarrely attempts to argue that there is not evidence that the Plaintiff was a union member, but Doc. 18-58, 18-59, and 18-60 as well as the disciplinary documents offered as evidence by the Defendant fully establish that the Plaintiff was a union member.  Furthermore, there is evidence that the Plaintiff was denied union representation and was subjected to actions that led to her termination without being provided union representation.  (SOF 27a-b, 31a-c).  There is certainly sufficient evidence discussed above, especially regarding the fact that the Plaintiff was subjected to the disciplinary process for taking FMLA leave that a reasonable jury could conclude that the Plaintiff had been terminated for her union association, accordingly summary judgment must be denied.

## CONCLUSION

The Plaintiff has produced significant evidence creating material issues of reasonable fact on each of the Plaintiff's claims.  Such substantial evidence could certainly be relied upon by a reasonable jury in finding for the Plaintiff on any or all of his claims, therefore summary judgment is inappropriate and the Defendants' motion should be denied.

PRECIOUS PERRY, Plaintiff,

By/s/ Abby Osborn_____
Abby Osborn, #18164
Shiffermiller Law Office, P.C., L.L.O.
1002 G Street
Lincoln, Nebraska 68508
402-484-7700
402-484-7714 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2013, I electronically filed the foregoing Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Michael Thew
Deputy County Attorney
575 South 10th Street
Lincoln, Nebraska 68508

/s/ Abby Osborn_____
Abby Osborn