IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

PRECIOUS PERRY,                          )
                                         )
                    Plaintiff,           )            4:13CV3013
                                         )
        v.                               )
                                         )          **MEMORANDUM**
LANCASTER COUNTY, NEBRASKA,              )           **AND ORDER**
                                         )
                    Defendant.           )
                                         )
_____          )

Plaintiff Precious Perry, a former juvenile detention officer at the Lancaster County Youth Services Center, claims she was discriminated and retaliated against, harassed, and ultimately terminated from her employment on the basis of her use of leave pursuant to the Family and Medical Leave Act, her race, and her husband's disability. In addition, Perry claims that she was denied employment because of her membership in a labor organization, contrary to the provisions of Neb. Rev. Stat. § 48-217 and Neb. Const. art. XV, §13. (Filing 1-1, Complaint Removed from District Court of Lancaster County, Nebraska).[1] Defendant Lancaster County has filed a motion for summary judgment as to all of Perry's claims. (Filing 17.)

## I. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). After the movant has demonstrated the absence of a genuine

---

[1]Perry brings her claims under Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-2, *et seq*.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq*.; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2612; the Nebraska Fair Employment Practice Act ("FEPA"), Neb. Rev. Stat. § 48-1104, *et seq*.; and 42 U.S.C. § 1981. (Filing 1-1.)

issue of material fact, the nonmovant must respond by submitting evidence that sets out specific facts showing that there is a genuine issue for trial. *Id*. In doing so, the nonmovant must substantiate her allegations with "sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id*. "The basic inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Jackson*, 643 F.3d at 1085 (quoting *Torgerson*, 643 F.3d at 1042).

## II.  UNDISPUTED MATERIAL FACTS[2]

1.     Plaintiff Precious Perry ("Perry") is an African-American resident and citizen of Lincoln, Lancaster County, Nebraska. (Filing 1-1, Complaint Removed from District Court of Lancaster County ¶ 2.)

---

[2]Our local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." This statement of facts must "consist of <u>short</u> numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." The opposing party must respond to the moving party's statement of material facts in a brief containing separate numbered paragraphs with citations to supporting references and with identification of material facts that are disputed. Properly-referenced material facts in the movant's statement of facts will be "considered admitted unless controverted in the opposing party's response." NECivR 56.1.  The material facts below, appearing in numbered paragraphs, are those that have not been properly disputed pursuant to this court's local rules. *See Ellis v. Houston*, 742 F.3d 307, 318, 321 (8th Cir. 2014) (referring to district court's opinion on summary judgment as a "lengthy opinion resembl[ing] in appearance and organization a decision on the merits made after a trial" and noting the "numbered findings").

2.     Defendant County of Lancaster, Nebraska, ("the County") is a political subdivision duly formed and existing under the laws of the State of Nebraska.  (Filing 1-1, Complaint ¶ 3.)

3.     At all relevant times, the County operated a juvenile detention facility located in Lincoln, Nebraska.  At the time of the events alleged in Perry's complaint, that facility was known as the Youth Services Center ("YSC").  (Filing 18-1, Dep. Precious Perry 5:20-6:9.)

4.     Perry was originally hired to work at the County's juvenile detention facility in 1998, and she continued working in that capacity until her employment was terminated on February 22, 2012.  (Filing 1-1, Complaint ¶¶ 4, 17.)

5.     At the time of the events alleged in the complaint, Perry held the position of juvenile detention officer.  (Filing 1-1, Complaint ¶ 5.)  In that capacity, she was responsible for performing a variety of duties, with the primary responsibility being security.  (Filing 18-1, Perry Dep. 12:5-13:6.)  Juvenile detention officers were directly supervised by duty supervisors; duty supervisors were supervised by team leaders; and above team leaders in the chain of command were a deputy director, and, ultimately, the department director.  (Filing 18-1, Perry Dep. 17:18-20:5.)  At the relevant time, Ryan Timmerman was a duty supervisor with whom Perry worked on occasion.  (Filing 18-2, Perry Dep. 137:7-138:20.)  Eric Rezabek was a team leader and Perry's direct supervisor.  Annette Thompson was the deputy director.  Michelle Schindler was the director.  (Filing 18-1, Perry Dep. 16:4-12, 22:5-7, 85:3-87:3.)  Only Schindler had the technical authority to impose discipline on YSC employees.  (Filing 18-60, Tr. Lancaster County Personnel Board Hearing at 265:12-15; Filing 18-38, Aff. Michelle Schindler ¶ 3.)

6.     On Thursday, April 7, 2011, Perry sent an e-mail to YSC Director Schindler requesting leave without pay from Sunday, April 10, through Tuesday, April 19, 2011, with possible intermittent leave for up to six weeks thereafter, all in connection with surgery that was scheduled for her husband, Mike Perry, for a serious medical need. Perry stated that her husband's surgery was scheduled for April 12, but "pre-op" tests were required on April 11. She promised to "submit my leave forms for the time specified above today."  (Filing 18-4.) Perry had already submitted the necessary medical certification forms to the medical

providers prior to sending her e-mail to Schindler.  (Filing 18-1, Perry Dep. 34:21-36:13.)

7.      In response to that e-mail, Schindler contacted her administrative aide, who, in turn, requested that a clerk, Dena Hupp, "do an fmla letter."  (Filing 18-4; Filing 18-1, Perry Dep. 31:2-33:1.)  That letter, which included a copy of the County's Family and Medical Leave Act policy, was signed by Schindler and sent to Perry on April 7, 2011. (Filing 18-6.)  The letter acknowledged the office's notification of Perry's "need to be off work"; acknowledged that Perry's husband's condition may be considered a serious health condition under the FMLA; requested that a physician complete an FMLA medical certification form and Perry fill out an FMLA application; and directed Perry to return the form and application as soon as possible.  The letter stated: "Beginning April 10, 2011, your leave from work will be counted against your twelve weeks of FMLA leave entitlement." (Filing 18-6.)  Perry acknowledged that she received the letter.  (Filing 18-1, Perry Dep. 32:17-34:19.)  On April 7, 2001, Perry also filled out a leave request form and placed it in the office mailbox of YSC Director Schindler.  (Filing 18-5; Filing 18-1, Perry Dep. 26:17-28:2.)

8.      On Friday, April 8, Perry learned that her husband's surgery had been cancelled, at which time she received an itinerary of medical testing that would be done in lieu of immediate surgery.  On April 10, 2011, Perry reported to work and completed her shift despite having previously requested the day off as FMLA leave.  (Filing 18-1, Perry Dep. 45:8-46:24.)

9.      Although the new medical itinerary did not require Perry and her husband to be at the hospital on Monday, April 11, Perry did not report to work her regularly scheduled shift on that day, but her husband—also a county employee—did.  A supervisor attempted to contact Perry about her absence, but was unsuccessful.  After receiving several phone calls from co-workers warning her that she had failed to show up for work without calling, Perry called the facility at approximately 2:30 p.m.  During that telephone conversation with Records Manager Tina Dingman, Perry acknowledged that she had not received confirmation that her FMLA leave request had been approved.  (Filing 18-1, Perry Dep. 41:3-43:11; 62:24-63:7.)

4

10.     Perry failed to advise anyone at YSC of the changes in plans, either on Sunday, April 10, when she went into work, or on Monday, April 11, when she spoke with Ms. Dingman on the telephone.  (Filing 18-1, Perry Dep. 44:11-53:17.)  Perry testified that instead of immediate surgery, her husband would undergo a "transplant evaluation," so she had "spent [Monday, April 11] on the phone with the nurse off and on to pin down exactly what we need to do . . . who we were supposed to contact as far as hotel, as far as what he needed to do for procedures and preparation," and she knew "that it wasn't something I could . . . have dealt with at work."  (Filing 18-1, Perry Dep. 46:24; 54:3-19, 57:2-4.)

11.     Perry's original FMLA leave request indicated that leave was being sought for the period from April 10 through April 19, 2011.  However, because Perry reported to work and completed her April 10, 2011, shift despite having previously requested the day off as FMLA leave, Perry's leave request form was later amended by administrative aide Melissa Hood to indicate that leave was being sought for the period from April 11 through April 19, 2011.  (Filing 18-5; Filing 18-57, Aff. Melissa M. Hood ¶ 5.)

12.     Despite her previous request for FMLA leave through April 19, 2011, Perry returned to work on Monday, April 18, 2011, and worked her regular shift.  On that date, Perry told her duty supervisor and payroll clerk Dena Hupp that her husband's surgery had been cancelled.  (Filing 18-1, Perry Dep. 44:4-45:1, 64:12-65:24.)

13.     On April 20, 2011, Perry submitted the required medical certification statement that had been completed and signed by her husband's medical provider.   The certification stated that treatment had been provided on April 12, 13, and 14, 2001, and that Perry's husband had "end stage liver disease & tumors in liver."  (Filing 18-7.)

14.     On April 28, 2011, YSC Director Schindler informed Perry by letter that her request for FMLA leave was approved for April 12, 13, and 14, 2011, and that time would be counted against her 12 weeks of FMLA leave entitlement.  The letter also stated that Schindler did not believe Perry qualified for FMLA leave to care for her husband on April 10, 11, 15, 16, 17, 18, and 19, and Perry's entitlement to leave without pay for this non-FMLA leave was "still under review."  (Filing 18-8.)

5

15.     On April 29, 2011, YSC Director Schindler sent a letter to Perry proposing to suspend her for one working day for alleged violations of a number of provisions contained in the Lancaster County Personnel Rules, the YSC Employee Handbook, and the existing labor agreement between the County and the bargaining unit that represented employees of YSC.  (Filing 18-3[3].)  In general, those provisions related to procedural requirements for requesting and obtaining leave and the standards of conduct applicable to YSC employees.  The letter stated that several rules and policies appeared to have been violated, including abuse and inappropriate use of FMLA leave, failure to submit FMLA leave requests in writing and obtain written approval for such leave in advance, failure to submit FMLA forms 30 days in advance for planned medical treatment, and failure to make management aware of relevant or new facts regarding leave requests.  The letter cited several alleged instances of past disciplinary actions against Perry relating to attendance issues and also informed Perry that prior to making a final decision regarding the proposed disciplinary action, YSC Director Schindler would be willing to meet with Perry and consider any evidence or arguments she wished to present as mitigating factors in connection with the proposed discipline.  (Filing 18-3.)

16.     The County has filed evidence establishing Perry's history of attendance-and leave-related problems, including Perry's reprimand in August 2006 for requesting leave Perry did not have.  (Filing 18-38, Schindler Aff. ¶ 8 & Ex. 1 (Filing 18-39).)  The reprimand stated, "Leave without pay requires the pre-approval of the Director" and "YOU ARE ADVISED THAT A SIMILAR VIOLATION WILL RESULT IN MORE SEVERE DISCIPLINARY ACTION AS OUTLINED IN THE JUVENILE DETENTION CENTER HANDBOOK AND COUNTY PERSONNEL RULES."  (Filing 18-39.)   Perry's

---

[3]Perry moves to exclude Filing 18-3 in its entirety, which consists of a six-page letter of proposed discipline dated April 29, 2011, written by Michelle Schindler and addressed to Perry.  Perry claims the entire document is "replete with hearsay evidence and lacking foundation for the statements made within."  (Filing 28, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF p. 4.)  Perry's blanket objection is denied, as she fails to specify which portions are hearsay and what foundation is lacking, making it impossible for the court to make an evidentiary ruling.  To the extent I have cited Filing 18-3 or information contained therein, I conclude that the portions referenced are admissible for nonhearsay purposes and are supported by adequate foundation.

6

performance evaluations from 2007 to 2011 (Filings 18-38 to 18-44) indicate less-than-satisfactory ratings for attendance and comments from supervisors relating to attendance and leave problems, such as, "This year I need Precious to focus on her attendance, including her punctuality and her use of leave as it pertains to filling out proper leave requests to cover her time off. There have been several instances where she has not shown up for shifts and leave was not necessarily [a]pproved[] or communicated." (Filing 18-41 at CM/ECF p. 2 (Lancaster County Employee Performance Evaluation dated June 17, 2009, noting that Perry refused to sign the evaluation because she believed "she should not be held accountable for leave requests as she was not trained how to fill them out. Does not agree with her attendance issues."); Filing 18-44, Discipline History of Precious Lomack-Perry (1/25/2007 written warning for taking leave without prior approval; 12/9/2010 reprimand for failure to report to work as scheduled).)

17.     The predisciplinary meeting occurred on May 20, 2011, and was attended by Schindler, Perry, Perry's attorney, and a union representative. Based upon the information provided at that meeting, Schindler reduced the proposed disciplinary action to a written warning and required Perry to adhere to the YSC attendance policy and review and sign off on the County's FMLA policy. As a result of the written warning, Perry did not lose any pay or benefits. (Filing 18-9; Filing 18-1, Perry Dep. 73:21-23; Filing 18-38, Schindler Aff. ¶ 9.)

18.     Following the written warning on May 25, 2011, Perry requested and received a total of 97.75 additional hours of FMLA leave in connection with her husband's serious medical condition prior to termination of her employment in February of 2012. (Filing 18-16 at CM/ECF pp. 3 & 5.) Further, County records show that prior to April 2011, Perry received approval for 15 FMLA requests in seven different FMLA years, for a total of 1,172.51 hours. (Filing 18-2, Perry Dep. 130:6-133:4; Filing 18-16.)

19.     Following her receipt of the written warning in May 2011, Perry was involved in a number of situations that she characterized as harassment. First, approximately a week after Perry received the warning, team leader Eric Rezabek "screamed" at Perry for walking in on a shift briefing. Eventually that situation was resolved when Rezabek apologized to Perry. Perry had previously not had problems with Rezabek, nor did she have any further

problems with him following this incident.  (Filing 18-1, Perry Dep. 74:1-80:3.)  The second situation involved a supervisor, Tina Dingman, who allegedly discarded some of Perry's personal items while cleaning out the break room at YSC.  (Filing 18-36, Dep. Teresa Wymore 37:1-38:19; Filing 18-1, Perry Dep. 107:5-108:24.)  Third, Perry had a number of confrontations with her supervisor, Ryan Timmerman.

20.     For example, on December 7, 2011, Perry was escorting a group of detainees to a classroom at YSC.  One of the detainees had materials with her that she did not need at that time.  Perry directed her to place the materials on the hallway floor and retrieve them when they returned to the hallway on their way back from the classroom.  When they returned, however, the materials were gone and the detainee became upset. Perry inquired of supervisor Timmerman if he had seen the materials.  He responded by stating, "you mean the stuff that's not supposed to be sitting in the hallway?"  Perry repeated her inquiry a number of times thereafter, and on each occasion received essentially the same response from Timmerman, causing the youth to become agitated and to cry.  The following day, the youth found her materials at a table in the dining room.  Perry raised the issue with Rezabek on January 3, 2012, and he told her that the items should not have been left in the hallway because "it could result in a youth throwing the items."  (Filing 18-15, Perry's [1]2/8/12 Employee Incident Report Regarding JDS Timmerman at CM/ECF pp. 3-5.)

21.     On December 29, 2011, Timmerman, in the presence of a detainee, confronted Perry about being on break too long.  Perry claims she began her break 15 minutes later than Timmerman believed.  Perry reported the incident to team leader Rezabek on January 3, 2012, who told Perry he would speak to Timmerman.  (Filing 18-15, Perry's 1/3/12 Employee Incident Report Regarding JDS Timmerman at CM/ECF pp. 6-7; Filing 18-58, Tr. Lancaster County Personnel Board Hearing at 71:3-10.)  Perry testified that after "an incident with family medical," she felt as though Timmerman "turned up the pressure, 'cause he would attack me and verbalize negative comments in front of kids . . . it was more like he was trying to get me to be upset."  (Filing 18-1, Perry Dep. 93:23-95:1.)

22.     Perry has filed evidence that a fellow juvenile detention officer believed Perry was "targeted" and "called out on things" because of "other coworkers complaining about her missing work, taking too much sick time."  (Filing 18-35, Dep. Darwin Anderson 31:1-9,

43:15-44:12; Filing 18-37, Dep. Kelly Ems Wood 21:23-22:8 (Perry's "time off due to her husband, her mother and her father . . . could possibly be one of the reasons" for Perry's treatment).)  Another officer testified that Perry was "harrassed by a supervisor . . . between 2011 and 2012" because Perry's supervisor, Mr. Timmerman, spoke to her in a "harsh tone . . . in terms of directives on the phone or inquiries."  (Filing 18-36, Dep. Teresa F. Wymore 34:23-36:21, 40:14-41:9.)  A third juvenile detention office stated that "it seemed that they paid more attention to what [Perry] was doing than some of the other staff [like c]hecking up on her movement screens, her logging, stopping by the pod, calling her on the radio asking what she was doing . . . [g]oing into the control booth and aiming cameras at areas that she was working, like supervisors going in there," and that such targeting occurred "more often around the time that she was terminated."  (Filing 18-37, Wood Dep. 10:1-21, 19:1-17.)

23.     The instances of alleged harassment against Perry were not made known to YSC Director Schindler, YSC Deputy Director Thompson, or the Lancaster County personnel department until a February 16, 2012, pre-disciplinary meeting. (Filing 18-38, Schindler Aff. ¶ 17 (Schindler never received complaint from Perry regarding violation of Lancaster County policy that prohibits harassment in employment); Filing 18-55, Aff. Annette Thompson ¶ 8 (same); Filing 18-56, Aff. Patricia Kant ¶ 6 (same).)

24.     At all relevant times, juvenile detention officers at the YSC were responsible for performing personal observation checks on detainees to ensure their safety and security. The manner in which those checks were to be completed was set out in a written policy and accompanying "post order," which Perry testified "could have been in effect.  I'm not sure. The way that we conducted counts is different . . . ."  (Filing 18-24; Filing 18-25; Filing 18-2, Perry Dep. 159:21-160:25 ("I can't tell you if [the policy] was in effect. . . .  I don't know if this particular post order was in effect.").)

25.     The policy directed that personal observation checks be completed every 30 minutes for youth in "general population," every 15 minutes for those on "orientation or special management status," and every 4 minutes for youth having special problems.  The checks were to be conducted using the data recorder, also referred to as the "probe" or "Morse Watchman."  (Filing 18-24 at CM/ECF p. 3; Filing 18-2, Perry Dep. 165:7-12.)  The

9

policy required that, at specified intervals, staff was to visually observe detainees in their rooms and then record that observation by touching the data recorder to a pad containing a computer chip which was located on the wall adjoining the room. An electronic record of the check was then stored in the recorder.  (Filing 18-25 at CM/ECF p. 3 ¶ F; Filing 18-2, Perry Dep. 166:8-168:24.)  The supervisor on the third shift was then responsible for taking each probe to the control center and downloading the data onto the system, after which the system could print a report showing when the checks were made. (Filing 18-25 at CM/ECF p. 8 ¶ A; Filing 18-2, Perry Dep. 170:13-17.)  That report was known as the Tour Pro.  (Filing 18-26.)  The policy and post order also directed that if a probe was inoperable, checks should be recorded manually on prescribed forms and staff should notify the duty supervisor of the situation.  (Filing 18-24 at CM/ECF p. 3 ¶ 10; Filing 18-25 at CM/ECF pp. 3-4 ¶ I.)  At the YSC, detention officers performed 15-minute checks on paper in writing when the probes were not working.  (Filing 18-35, Anderson Dep. 8:22-24.)

26.    The policy stated that in the event of missed checks, the duty supervisor was to investigate, discuss the matter with the officer who missed the checks, and determine if discipline should follow.  (Filing 18-25 at CM/ECF p. 1.)  The policy also provided that one to two missed checks in a quarter would result in a written warning, three to four would result in a written reprimand, and additional missed checks would "result in suspension(s) and/or termination."  (Filing 18-25 at CM/ECF p. 2.)

27.    On January 5, 2012, authorities from another county brought a detainee to be held at YSC.  Because the detainee had been up all night with police and had not finished the book-in process until approximately 5:00 a.m., staff was advised that she should be allowed to remain in her cell and sleep during the day.  That youth was placed in Room E5 in the housing area known as E-pod, where Perry was assigned to work during first shift (6:30 a.m. to 2:30 p.m.) on January 5, 2012.  (Filing 18-31 at CM/ECF p. 2.)

28.    Perry's supervisor, Ryan Timmerman, decided to investigate the personal observation checks that had been made in E-pod on January 5, 2012, after recalling that no officer had requested assistance to perform checks in E-pod, despite the fact that the sleeping youth remained in her room all day while others in the same pod were escorted to breakfast and lunch.  (Filing 18-59, Tr. Lancaster County Personnel Board Hearing at 129:1-130:3.)

10

Timmerman investigated whether personal observation checks had been done on January 5, 6, and 7, 2012, in all the pods, and he found other areas he would need to "investigate further as far as missed checks." (*Id*. at 132:13-19.)

29.     Timmerman's investigation revealed that on January 5, 2012, Perry performed checks with the Morse Watchman at 6:56 a.m. and at 2:34 p.m., with no checks in between. (Filing 18-59, Tr. Lancaster County Personnel Board Hearing at 138:3-16.)

30.     Timmerman advised Deputy Director Annette Thompson about his investigation so she would be aware of it, and he also contacted team leader Eric Rezabek about the situation. (Filing 18-59, Tr. Lancaster County Personnel Board Hearing at 140:13-141:22.) Rezabek and Timmerman then discussed the matter with Perry because they "were looking for information in regards to the checks that [they] didn't have any documentation for. . . .  It's a matter of making sure that [they] have all of [their] documentation in case . . . [they] get an audit from juvenile standards . . . ." (*Id*. at 141:22-143:18.)  When asked why there was no evidence of probe or written checks having been performed on the sleeping youth in E-pod on January 5, 2012, Perry stated "that she had done visual checks." (*Id*. at 144:1-12.)  She did not indicate that she had misplaced the probe or that she had recorded the checks on paper. (*Id*. at 144:13-18.)  Perry asked for a union steward during this meeting, but Rezabek told her they were "just asking [her] questions at this time." (Filing 18-2, Perry Dep. 180:3-6, 183:13-16.)   Timmerman stated that union stewards are used to protect employees' rights in disciplinary actions, and the meeting with Perry was "not a disciplinary action of any kind," although Timmerman admitted that Perry's comments during the meeting were used to justify Perry's later discipline for missed checks. (Filing 18-59 at 156:4-19.)

31.     Perry has presented evidence that she kept a written check sheet on January 5, 2012, and that she placed her written check sheet in the drawer of the pod desk at the conclusion of her shift. (Filing 18-30 (copy of check sheet); Filing 18-15 at CM/ECF pp. 8-13 (Employee Narrative by Perry regarding her activities on January 5, 2012); Filing 18-58 at 53:23-54:5.)  However, Perry did not tell Rezabek about the written check sheet she had kept on January 5, 2012, during her meeting with Rezabek and Timmerman because Perry

was not sure what date Rezabek was asking her about, as a computer glitch caused the dates on Rezabek's documentation to be incorrect.  (Filing 18-58 at 62:5-10, 135:9-17.)

32.     Timmerman gave the information he had gathered regarding Perry's activities on January 5, 2012, to Deputy Director Thompson.  (Filing 18-59 at 145:24-146:1.)  In order to verify the information Timmerman had given her, Thompson reviewed the relevant computer records documenting intercom and door actions in the facility; footage from security cameras located in the facility; and computer logs.  (Filing 18-55, Thompson Aff. ¶ 4.)  Based on her independent review of these materials, Thompson determined that Perry missed 40 personal observation checks during her shift in E-pod on January 5, 2012.  (Filing 18-55, Thompson Aff. ¶ 6.)

33.     Deputy Director Thompson apprised YSC Director Schindler of the information she had collected.  On the basis of that information, Schindler prepared and sent to Perry a letter dated January 31, 2012, proposing to terminate her employment.  In that letter, Schindler indicated that she would meet with Perry and/or her representatives at a pre-disciplinary meeting to consider evidence or arguments regarding any mitigating factors prior to finalizing her decision.  (Filing 18-28.)  Schindler also listed the facts as they had been reported to her regarding Perry's activities on January 5, 2012, including: (1) the Tour Pro Report indicated that security checks has not been performed between 6:56 a.m. and 2:34 p.m.; (2) Perry claimed that she opened the door to one youth's room several times attempting to wake her up, and thus checks were not needed, but the Door Action Report showed the door opened only four times, resulting in 11 missed checks on the youth, who was 14 years old, was taking four psychotropic medications, and had not slept all night; (3) Perry missed 40 total checks[4] in her pod; (4) during the breakfast hour, Perry opened all doors at once at 7:20 a.m., which is a security violation; (5) during breakfast and lunch, Perry left some youth in the pod alone while she accompanied other youth to the dining hall; (6) Perry did not have her youth participate in mandatory programming; and (7) Perry had

---

[4]This number was later reduced to 35.  (Filing 18-38, Schindler Aff. ¶ 11; Filing 18-54, Schindler Aff. ¶ 10.)  This number represents the number of 30-minute checks missed, as required by State Jail Standards, rather than the more stringent 15-minute-check requirement contained in agency policy.  (Filing 18-54, Schindler Aff. ¶ 10.)

previously—and repeatedly—been disciplined for missing checks and leaving youth unsupervised and unsecured. (Filing 18-28.) Indeed, summaries derived from YSC records indicate that between June 23, 2003, and February 22, 2012, Perry was disciplined via warnings, reprimands, suspensions, and ultimately termination, for missing checks and leaving youth unsupervised and unsecured on 25 separate dates. (Filing 18-38, Schindler Aff. ¶ 15; Filing 18-44.)

34.    On February 16, 2012, a pre-disciplinary meeting was held, which included Perry; two representatives of AFSCME Local 2468, the labor organization representing her; YSC Director Schindler; Deputy Director Annette Thompson; and Personnel Coordinator Pat Kant. At that meeting, Perry and her representatives were afforded the opportunity to present information and evidence relating to the proposed disciplinary action. (Filing 18-2, Perry Dep. 186:10-187:11; Filing 18-54, Schindler Aff. ¶ 8.)

35.    Among the matters discussed at the pre-disciplinary meeting was a copy of an Individual 15-Minute Room Monitoring Sheet that Perry first produced during the meeting. In connection with that document, Perry claimed that she had misplaced the probe, and thus recorded checks manually on a form, as provided in the applicable post order. The existence of the Monitoring Sheet had not been disclosed either on the date that it was made or at the meeting with supervisor Timmerman and team leader Rezabek regarding the missed checks. (Filing 18-58, Tr. Lancaster County Personnel Board Hearing at 55:18-59:5; Filing 18-30; Filing 18-38 ¶ 12.)

36.    Following the pre-disciplinary meeting, Schindler concluded that termination of Perry's employment was warranted, and she prepared and delivered a letter to Perry informing her of that decision. (Filing 18-31, Disciplinary Decision.)

37.    Pursuant to Neb. Rev. Stat. §23-2522 and the implementing provisions of the Lancaster County Personnel Rules, Perry appealed her termination to the Lancaster County Personnel Policy Board, a statutorily mandated body composed of six individuals not employed by the County, that is charged with hearing and deciding appeals of disciplinary actions taken against County employees. Two members are appointed by the County Board, two are appointed by County elected officials, and two are appointed by classified employees

13

of the County.  Neb. Rev. Stat. § 23-2521. Generally those members are attorneys and/or human resources professionals from the community.  On April 5, 2012, the Personnel Policy Board conducted a formal hearing on plaintiff's appeal.  At the conclusion of that hearing, the Personnel Policy Board voted 3 to 1 (2 members were absent) to uphold the termination. (Filing 18-58, Tr. Lancaster County Personnel Board Hearing; Filing 18-56, Kant Aff. ¶ 3.)

38.     On March 28, 2012, Perry filed a charge with the Office of the Nebraska Equal Opportunity Commission and the U.S. Equal Employment Opportunity Commission, alleging that her termination was based upon race, color, and disability. In October 2012, Perry received a determination from both entities. (Filing 18-32; Filing 1-1, Complaint ¶ 22.)

39.     Another juvenile detention officer named Hodges, a white male, was being investigated for "substantial checks being missed" at the same time as Perry, but Hodges resigned before the investigation was completed.  (Filing 18-59, Tr. Lancaster County Personnel Board Hearing at 154:18-156:1; Filing 18-38, Schindler Aff. ¶ 14.)
Schindler believed that Perry's case differed from all others because of the volume of checks missed in one shift, compounded by her failure to comply with mandatory programming, her commission of a security violation regarding improper operation of doors, and the fact that Perry's pod contained six residents, one of whom was a special security concern.  (Filing 18-54, Schindler Aff.)

40.     Perry has presented evidence that her co-workers also missed checks.  (Filing 18-35, Anderson Dep. 11:11-20 ("[T]here are times when people have missed checks. . . . I've missed checks. . . .  I don't believe there's anybody that's been here that hasn't missed a check at one time or another in their career here on a 15-minute check.").)  Other juvenile detention officers testified that they do not know of "anybody being terminated for missing checks," although juvenile detention officer Darwin Anderson admits that he is "not privy to why people are terminated" and reasons for termination are "gossip, the rumor mill." (Filing 18-35, Anderson Dep. 21:9-12; Filing 18-36, Wymore Dep. 20:19-21; Filing 18-37, Wood Dep. 20:4.)  Further, "there were times when checks were missed, but . . . people weren't being called out on them."  (Filing 18-35, Anderson Dep. 18:7-9.)  While warnings are typically issued for a missed check, "[i]f it's a continual pattern, then, yes, we would get called out on it and reprimanded."  (Filing 18-37, Wood Dep. 20:20-25; Filing 18-35,

14

Anderson Dep. 15:3-5.)[5]  The disciplinary histories of other juvenile detention officers derived from YSC records confirm that other officers received written warnings and reprimands for missed security checks.  (Filing 18-45; Filing 18-46; Filing 18-47; Filing 18-48; Filing 18-49; Filing 18-50; Filing 18-51; Filing 18-52; Filing 18-53.)

41.    Anderson was Perry's co-worker and temporary supervisor for four months. (Filing 18-35, Anderson Dep. 6:11-7:17.)  He believed Perry adequately performed the duties that were required of her as a juvenile detention officer. (Filing 18-35, Anderson Dep. 7:24-8:6.)  Juvenile detention officer Wymore also had an opportunity to observe Perry's work and believed that Perry always performed adequately.  (Filing 18-36, Wymore Dep. 38:20-39:3.)

42.    YSC policy is that cell doors are to be opened one at a time, but "there are times when" more than one door might be open at a time, such as when "[s]taff are in a hurry" or in an emergency.  "The way it's supposed to be and the way it is actually done varies from shift to shift, from supervisor to supervisor." (Filing 18-35, Anderson Dep. 32:7-35:3.)  On March 23, 2012, juvenile detention officer Thomas Gandara was reprimanded for not securing doors properly.  (Filing 18-46 (discipline history showing five written warnings

---

[5]Perry asserts as an undisputed material fact that Darwin Anderson witnessed juvenile detention officer Joe Monroe leaving his kids unattended from 8:30 to 11:00 a.m. on "a Sunday," and he did not face disciplinary action for his missed checks.  (Filing 28, Pl.'s Br. Opp'n Mot. Summ. J. at CM/ECF p. 22.)  However, Anderson "d[id]n't know the exact date" of Monroe's missed checks.  (Filing 18-35, Anderson Dep. 22:6-27:2.)  The disciplinary summary for Joe Monroe indicates that Monroe received a reprimand and 16 written warnings for missed security checks on several dates between March 16, 2005, and February 16, 2011.  (Filing 18-50.)  Because Anderson cannot identify the date on which these supposed missed checks occurred, the evidence fails to establish or refute the fact that Monroe was not disciplined for missing security checks on the unknown date Anderson had in mind, and I shall not consider it an undisputed material fact.  Perry also asserts that a letter (Filing 18-36 at CM/ECF p. 43) written by Terry Wymore to YSC management about "C. Schmidt" missing checks for two hours on August 3, 2012, resulted in no discipline, citing to Schmidt's disciplinary summary (Filing 18-52).  However, the disciplinary summary only covers discipline received in 2005 and 2006.  Thus, it is not undisputed that Schmidt did not receive discipline for missed checks on August 3, 2012.

and one reprimand in nine years).)  On November 21, 2011, juvenile detention officer Matthew Lollmann received a written reprimand for "[s]ecuring doors."  (Filing 18-49.)

## III.  DISCUSSION

## A.  FMLA CLAIMS

Under the FMLA, eligible employees are entitled to 12 weeks of leave during any 12-month period for certain family or medical reasons.  *Jackson v. City of Hot Springs*, No. 13-1772, 2014 WL 1876129 at \*3 (8th Cir. May 12, 2014); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (analyzing termination of employment under ADA and FMLA).  The FMLA makes it unlawful for employers to "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights and to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA.  29 U.S.C. § 2615.

The Eighth Circuit Court of Appeals has recognized three types of claims arising under the FMLA:

(1) ***Entitlement Claim***:  "The first type . . . occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act. . . .  An employee proceeding on this theory need not show that an employer acted with discriminatory intent. . . .  [W]e think it helpful to describe this as an 'entitlement' claim—an employee claims the denial of a benefit to which he is entitled under the statute."  *Pulczinski*, 691 F.3d at 1005 (internal citations omitted).

(2) ***Retaliation Claim***:  "A second type of claim . . . is analogous to retaliation claims that are familiar under Title VII and other federal antidiscrimination statutes. If an employee opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave—then the employer may not for that reason take adverse action against the employee

who is engaged in the opposition.  As under Title VII, this claim is naturally described as a "retaliation" claim." *Id*. at 1005-06 (internal citations omitted).

(3)    ***Discrimination Claim***:  "A third type of claim recognized by this court's precedent arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Id*. at 1006.

Although not precisely articulated in her complaint, it appears that Perry asserts entitlement and discrimination claims.

### *1. Entitlement Claim*

The FMLA provides that "an eligible employee shall be entitled to . . . leave . . . [i]n order to care for the spouse . . . of the employee, if such spouse . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).[6]  Perry first claims that the County deprived her of this statutory entitlement under the FMLA by unlawfully denying her FMLA leave for the entire period for which she requested leave.  Specifically, Perry claims that her request for FMLA leave to care for her husband was only approved for April 12, 13, and 14, 2011, but not for April 10-11 and April 15-19, and that she was disciplined for taking time off.

The uncontroverted evidence shows that Perry informed the County of her need for leave via e-mail on Thursday, April 7, 2011.  That e-mail indicated that Perry was seeking

---

[6]*Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327 (2012) held that Congress did not validly abrogate states' sovereign immunity from suits for money damages in enacting the FMLA's self-care provision, 29 U.S.C. § 2612(a)(1)(D).  That provision is not at issue here.

17

leave for April 10 through 19, 2011, and she would submit the required forms that same day. The leave form submitted by Perry specified the same dates. However, Perry showed up for work and worked her regular shift on Sunday, April 10—the first day of leave she had requested—as well as on April 18 and 19—other days for which she had requested FMLA leave. Perry was granted FMLA leave for April 12, 13, and 14, pursuant to the Medical Certification Statement provided by Perry's husband's health care provider (Filing 18-7) indicating that medical treatment had occurred on those dates. April 15 and 16 were Perry's regular days off. Thus, County action was responsible for denial of FMLA leave for only two of the dates originally requested—Monday, April 11, and Sunday, April 17. Therefore, Perry's claim is that the County violated the FMLA when it designated April 11 and 17, 2011, as regular leave without pay instead of classifying those dates as FMLA leave. (Filing 18-38, Schindler Aff. ¶ 9.)

While the parties focus on whether or not YSC Director Schindler was justified in denying Perry FMLA leave for April 11 and 17, 2011, I need not engage in that analysis because "[t]he FMLA 'provides no relief unless the employee has been prejudiced by the violation.'" *Pulczinski*, 691 F.3d at 1006 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). In *Pulczinski*, the plaintiff sought FMLA leave to deal with his son's asthma. Before he could complete and submit the necessary FMLA paperwork, he was forced to miss work to care for his son. The employer classified the leave as "personal unexcused absence" and assessed "attendance points" against him for the absences. Because the number of attendance points justified termination under company policy, the employer suspended the plaintiff with pay to investigate the situation. Upon completion of the investigation, FMLA leave was granted retroactively and the plaintiff was allowed to return to work. In rejecting the plaintiff's claims that the employer's conduct constituted an actionable entitlement claim under the FMLA, the court stated, "Pulczinski does not allege that he was prejudiced by the misclassification of this absence. He was not denied compensation or benefits, *see* 29 U.S.C. § 2617(a)(1)(A)(i), and he has not specified any sort of equitable relief that is warranted. *See id.* § 2617(a)(1)(B). Without more, an allegation that a day of leave was misclassified does not entitle Pulczinski to relief." *Id.* at 1006-1007.

Perry's case presents precisely the same situation. Initially, Schindler proposed to suspend Perry without pay for one day due to the various problems identified in connection

18

with the requested FMLA leave.  However, after meeting with Perry and her representatives, that suspension was reduced to a written warning.  The only consequence attached to that action was the requirement that Perry review and adhere to the provisions of the YSC attendance policy and the County's FMLA policy.

Because FMLA leave is unpaid, Perry lost no compensation or benefits as a result of Schindler's decision to deny FMLA leave for April 11 and 17 and to instead classify the time as leave without pay.  Further, because the proposed suspension was reduced to a warning, Perry did not lose any pay or suffer any other direct consequences due to issuance of the warning itself.  Therefore, summary judgment must be granted in favor of the County on Perry's entitlement claim under the FMLA.

### 2.  Discrimination Claim

Perry also claims that she was disciplined, harassed, and ultimately terminated from her employment because she took FMLA leave to care for her husband.  Basing an adverse employment action on an employee's use of FMLA leave is actionable under the FMLA.  "[A]n employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA.  An employee can prove retaliation through circumstantial evidence,[7] using the *McDonnell Douglas* burden-shifting analysis."  *Jackson*, 2014 WL 1876129 at *3 (internal citations, alterations, and quotations omitted).

To establish a prima facie case of FMLA discrimination, Perry must show that (1) she engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) the materially adverse action was causally linked to the protected conduct.  If Perry establishes her prima facie case, the burden shifts to the County to proffer a "non-discriminatory, legitimate justification for its conduct, and then back to [Perry] to either introduce evidence to rebut the employer's justification as a pretext for discrimination, or

---

[7]Perry has not presented direct evidence of discrimination. Absent direct evidence, FMLA discrimination claims are evaluated under the *McDonnell Douglas* burden-shifting framework. *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116-17 (8th Cir. 2012).

introduce additional evidence proving actual discrimination." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1117 (8th Cir. 2012) (internal quotation marks and citation omitted).

Here, the warning and harassment Perry allegedly suffered after she took FMLA leave cannot be characterized "adverse employment actions" because neither of these things produced a "material employment disadvantage," but instead were "[m]ere inconvenience[s] without any decrease in title, salary or benefits or that result[ed] only in minor changes in working conditions." *Chappell*, 675 F.3d at 1117. Therefore, the only adverse employment action upon which an FMLA discrimination claim might be based is Perry's termination, and in order to establish a prima facie case, Perry must establish that her taking FMLA leave was causally linked to her termination. This she has failed to do. Simply put, the County has proved (and overwhelmingly so) that Perry's termination was solely attributable to the events of January 5, 2012, and Perry's history of security-related issues, regardless of Perry's exercise of her FMLA rights.[8]

"If the employer can prove that it would have terminated the employee had the employee not exercised FMLA rights, the employer will not be liable." *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012). There is absolutely no indication whatsoever that Perry's termination resulted from her use of FMLA leave, and it is clear that the County would have (and did) terminate Perry even if she had never exercised her rights under the FMLA. Furthermore, Perry's unchallenged use of FMLA leave on numerous occasions over time[9] supports the County's contention that Perry was fired only for security-related violations. *Chappell*, 675 F.3d at 1118. Therefore, the County's motion for summary judgment on Perry's FMLA discrimination claim shall be granted.

---

[8]The facts on which Perry's termination was supposedly based, as Schindler perceived them, are discussed in greater detail below in conjunction with Perry's race claim.

[9]Prior to April 2011, Perry received approval for 15 FMLA requests in 7 different FMLA years, for a total of 1,172.51 hours. (Filing 18-2, Perry Dep. 130:6-133:4; Filing 18-16.) Following the written warning on May 25, 2011, Perry requested and received a total of 97.75 additional hours of FMLA leave in connection with her husband's serious medical condition prior to termination of her employment in February of 2012. (Filing 18-16 at CM/ECF pp. 3 & 5.)

## B.  RACE CLAIM

Perry claims that she was discriminated against, harassed, and terminated because of her race in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1); the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48–1104(1); and 42 U.S.C. § 1981.[10]

### *1.  Discrimination & Termination*

#### *a.  Prima Facie Case*

Perry's race discrimination claims are also analyzed under the *McDonnell Douglas* burden-shifting framework discussed above.  *Chappell*, 675 F.3d at 1118.  To establish a prima facie case of racial discrimination, Perry must demonstrate that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not part of the protected group were treated more favorably.  *Id.*

Assuming Perry has met the first three elements of her prima facie case, she has failed to show the fourth element—that employees who were "similarly situated in all relevant respects," and who were not African-American, were treated more favorably.  *Id.* at 1119.  The "relevant respects" are "the conduct of the employees and any disparity in their

---

[10]The same analysis can be applied to Perry's race claims under the NFEPA, Title VII, and 42 U.S.C. § 1981.  Both the Nebraska Supreme Court and the Eighth Circuit Court of Appeals have stated that the NFEPA "'is patterned after Title VII,' and, therefore, 'it is appropriate to consider federal court decisions construing the federal legislation' when considering questions under the NFEPA."  *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (quoting *City of Fort Calhoun v. Collins*, 500 N.W.2d 822, 825 (Neb. 1993); citing *Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002)).  Further, Section 1981 claims are analyzed under the same standards as Title VII claims.  *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005).  *See also Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1159 (D. Neb. 2012) ("The Court begins with the elements of Reyes' claim under Title VII, because the same framework applies to her claims under § 1981 and NFEPA.").

discipline." *Id*.  That is, Perry must "show that similarly situated employees committed the same conduct but were treated differently." *Robinson v. American Red Cross*, ___ F.3d ___, 2014 WL 2118710, at *4 (8th Cir. 2014).

Perry has not established that there were any other YSC employees who engaged in the same conduct for which Perry was terminated—that is, her activities on January 5, 2012, *combined with* her extensive history of security-related discipline.  Summaries of the disciplinary histories of Perry and nine co-workers whom Perry identified as having received preferential treatment are not comparable. Those summaries indicate that between June 23, 2003, and February 22, 2012, Perry was disciplined via warnings, reprimands, suspensions, and ultimately termination, for missing security checks and leaving youth unsupervised and unsecured on 25 separate dates.  Only one of Perry's co-workers (Kenneth Nolan) even comes close to the number of missed checks that were attributed to Perry.  (Filing 18-38, Schindler Aff. ¶ 15; Filings 18-44 to 18-53.)  The disciplinary summaries reflect that Nolan was repeatedly warned and reprimanded for missed security checks (as was Perry) and was suspended on two occasions, but not terminated.  However, there is no evidence that Nolan engaged in the same type of conduct as Perry was believed to have been on January 5, 2012. As Schindler explained:

> In Ms. Lomack-Perry's situation, there was no credible evidence that any checks were done for nearly an entire shift in a living unit that contained six residents. Compounding that problem was the fact that one of the residents of the housing unit was a 14[-]year[-]old youth with mental health concerns, who was currently using four psychotropic medications, and who had been traveling with police all night and did not arrive at the facility until approximately 5:00a.m.  That resident spent the entire first shift in her room, and there was no credible evidence that personal observation checks were ever performed on her for the entire time.  In addition, on at least two occasions Ms. Lomack-Perry left that resident unattended in the housing area while she accompanied other residents to meals. In addition, in the course of the investigation regarding security checks, it was discovered that Ms. Lomack-Perry had deviated substantially from scheduled programming for the day, and had violated agency policy by opening numerous individual room doors simultaneously.

(Filing 18-54 ¶ 9.)

22

Further, there is no evidence that Perry's conduct on January 5, 2012, as understood by Schindler, was similar to that of other co-workers to which Perry compared herself. (See Filing 18-54, Schindler Aff. ¶ 11 (distinguishing Perry's situation from Officer Joseph Monroe, noting that Monroe did not have access to a probe, was only supervising two residents, adhered to the programming schedule, otherwise complied with security requirements, and did not leave a potentially dangerous and vulnerable resident unattended); Filing 18-38, Schindler Aff. ¶ 14 (investigation of Officer Edward Hodges was in progress for a substantial amount of missed checks, but Hodges resigned before investigation complete).)

### b.  Reasons for Discharge and Pretext

Even if Perry had established a prima facie case, the defendants contend they terminated Perry's employment due to the events on January 5, 2012, and Perry's history of security-related issues—both of which constitute legitimate, nondiscriminatory reasons for her discharge. Perry, then, bears the burden of showing these reasons were a pretext for intentional discrimination. In order to establish pretext, the County's reasons for terminating Perry's employment must be false *and* discrimination must be the real reason. *Bone v. G4S Youth Svs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012).

To the extent Perry argues that there are fact questions regarding the reasons the County offered for her termination, as long as the County had a "good-faith" basis for discharging Perry, such fact questions do not preclude the entry of summary judgment. *Bone*, 686 F.3d at 955; *McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 861-62 (8th Cir. 2009) ("The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge. A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination.") (citations omitted).

23

Perry's evidence does not raise a reasonable inference that unlawful racial discrimination motivated her termination, as opposed to a good-faith belief that Perry was guilty of the conduct justifying her discharge.  It is undisputed that Perry's supervisor investigated the events of January 5, 2012, and found several security-related problems with Perry's performance that day.  Supervisor Timmerman then passed that information on to Deputy Director Thompson, who independently reviewed the relevant computer records documenting intercom and door actions in the facility; footage from security cameras located in the facility; and computer logs in order to verify Timmerman's information. (Filing 18-55, Thompson Aff. ¶ 4.)  Based on her review of these materials, Thompson determined that Perry missed 35 personal observation checks during her shift in E-pod on January 5, 2012. (Filing 18-55, Thompson Aff. ¶ 6.)

This information was then relayed to YSC Director Michelle Schindler, who prepared a letter of proposed termination based on the information she had been provided—specifically, that on January 5, 2012, the Tour Pro Report indicated that security checks has not been performed by Perry between 6:56 a.m. and 2:34 p.m.;  Perry claimed that she opened the door to one youth's room several times attempting to wake her up, and thus checks were not needed, but the Door Action Report showed the door opened only four times, resulting in 11 missed checks on the youth, who was 14 years old, was taking four psychotropic medications, and had not slept all night; Perry missed 35 total checks in her pod; during the breakfast hour, Perry opened all doors at once at 7:20 a.m., which is a security violation; during breakfast and lunch, Perry left some youth in the pod alone while she accompanied other youth to the dining hall; Perry did not have her youth participate in mandatory programming; and Perry had previously—and repeatedly—been disciplined for missing checks and leaving youth unsupervised and unsecured.  Indeed, summaries derived from YSC records indicate that between June 23, 2003, and February 22, 2012, Perry was disciplined via warnings, reprimands, and suspensions for missing checks and leaving youth unsupervised and unsecured on 25 separate dates. (Filing 18-38, Schindler Aff. ¶ 15; Filing 18-44.)

24

There is simply no evidence that Schindler did not honestly believe that Perry's conduct warranted termination of her employment, or that discrimination was the real reason for terminating her employment.[11]

### 2. Harassment

Perry also claims she was harassed because of her race, apparently based on four instances—Rezabek's screaming at her for walking in on a briefing; a fellow employee discarding Perry's items while cleaning an employee break room; Timmerman being unsupportive in Perry's efforts to locate a resident's books that were left in the hallway; and Timmerman's confronting Perry in front of a resident for being on break too long.

> Hostile work environment harassment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotations and citation omitted). To succeed on a harassment or hostile work environment claim under Title VII, [the plaintiff] must establish: "(1) [s]he is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and [her] protected-group status; (4) the harassment affected a term, condition, or privilege of [her] employment;

---

[11]Perry argues that "Schindler was merely a rubber stamp or unwitting 'cat's paw' for Rezabek and Timmerman's unlawful motive." (Filing 28 at CM/ECF p. 36.) Here, the evidence establishes that Rezabek and Timmerman gathered and delivered information after their investigation, and there is no evidence that they "initiated, exercised, or even possessed any influence or leverage over [Schindler's] decision to terminate [Perry]," *Qamhiyah v. Iowa State Univ. of Science & Tech.*, 566 F.3d 733, 744 (8th Cir. 2009) (internal quotation marks and citations omitted). Furthermore, all information provided by Rezabek and Timmerman was subject to Deputy Director Thompson's independent review using objective tools such as computer records and video footage to verify and compare Rezabek and Timmerman's information to Perry's version of the events on January 5, 2012. *Id.* at 744-45 (discussing *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006), and noting that cat's-paw argument was foreclosed when university president independently reviewed basis for plaintiff-coach's proposed termination before firing coach). Therefore, the evidence in this case does not support application of the cat's-paw theory.

and (5) [the employer] knew or should have known of the harassment and failed to take prompt and effective remedial action." *Robinson v. Valmont Ind.*, 238 F.3d 1045, 1047 (8th Cir. 2001).

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Svs.*, 728 F.3d 800, 805-06 (8th Cir. 2013). "The standard for demonstrating a hostile work environment under Title VII is demanding, and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Id.* (internal quotation marks and citation omitted).

In this case, I conclude that Perry has failed to establish both the third and fourth elements of her claim—a causal nexus between the harassment and her race and that the harassment affected a term, condition, or privilege of her employment.

### *a. Causal Nexus*

There is no evidence that any of the incidents Perry classifies as harassment were connected to Perry's race. In her deposition, Perry either "didn't know" why the acts of harassment occurred, or she attributed the events to her use of FMLA leave in April 2011. (Filing 18-1, Perry Dep. 73:21-79:25, 92:8-96:19, 107:14-111:7; Filing 18-2, Perry Dep. 141:22-25, 243:13-244:6.) YSC administrators did not receive any complaints from Perry about harassment pursuant to Lancaster County's policy. (Filing 18-38, Schindler Aff. ¶ 17; Filing 18-55, Thompson Aff. ¶ 8; Filing 18-56, Kant Aff. ¶ 6.) Further, none of Perry's co-workers attributed the alleged harassment to race. (Filing 18-36, Wymore Dep. 48:17-49:8 (Perry was treated differently because she was a woman); Filing 18-35, Anderson Dep. 47:9-14 ("there's nothing I could conclude that she was picked on because she was African-American, no"); Filing 18-37, Wood Dep. 22:9-20 (race was not a reason Perry was treated differently; "That's my opinion because if you would see the racial diversity of everybody that works at the detention center . . . we're . . . pretty inclusive").)

### *b.  Affected Term or Condition of Employment*

"[I]n order to find that the harassment affected a term, condition or privilege of employment, [Perry] must be able to establish that the conduct was extreme, such that intimidation and ridicule permeated the workplace." *Jackman*, 728 F.3d at 806. The environment must be objectively and subjectively offensive—that is, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701-02 (8th Cir. 1999).

The incidents Perry claims were harassment based on race, considered as a whole, are simply not severe or pervasive such that a reasonable person would consider her work environment to be hostile or abusive.  *See Ellis v. Houston*, 742 F.3d 307, 321 (8th Cir. 2014) (pattern of hostile conduct established by looking at all black officers on plaintiff's shift; officers experienced racist remarks on near daily basis in front of entire staff with supervisors actively joining in the "constant refrain of racist jokes"); *Dowd v. United Steelworkers of America, Local No. 286*, 253 F.3d 1093, 1102 (8th Cir. 2001) (reasonable juror could have found workplace was permeated with discrimination, ridicule, and insult when plaintiffs were subjected to racial slurs, threats of physical violence, and plaintiffs feared for their personal safety).

More fundamentally, however, not one of the incidents even had a "racial character or purpose," and this is not a case where non-racial incidents of harassment might be "noteworthy" because they were combined with "many instances of overt racial harassment." *Fuller v. Fiber Glass Systems, LP*, 618 F.3d 858, 864 (8th Cir. 2010) (jury could find that non-racial incidents of alleged harassment occurred because of race when there were also many instances of overt racial harassment); *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011) (no hostile work environment when, among other things, "there is no evidence that the alleged sabotage had a racial character or purpose if it was even sabotage").  *See also Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005) ("for conduct to be considered in a race-based hostile work environment claim, the conduct must have a racial character or purpose to support a hostile work environment claim" (internal quotation marks and citation omitted)); *Clay v. Lafarge North America*, 2013 WL 6250776, at *21 n.15 (S.D. Iowa Feb. 13, 2013) (incidents that had, among other things, "no explicit or inherent

27

racial connotation" would not create genuine issue of fact allowing plaintiff to survive summary judgment on hostile work environment claim based on race).

At bottom, the events Perry has characterized as harassment are nothing more than the types of "inter-departmental politics and personality conflicts" the Eighth Circuit Court of Appeals has rejected as bases for harassment claims. *Tademe v. Saint Cloud State University*, 328 F.3d 982, 991 (8th Cir. 2003). Because Perry has failed to prove that her race caused alleged harassment and that the harassment affected a term, condition, or privilege of her employment, she has failed to establish the elements of her prima facie case, and summary judgment is therefore appropriate on Perry's harassment claim.

## C. DISABILITY CLAIM

The ADA[12] prohibits discrimination "in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), which includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). To establish a violation of 42 U.S.C. § 12112(b)(4), Perry must show that the County acted "because of the known disability" of her husband—that is, she "must prove that the employer was motivated by knowledge of [her husband's] disability." *Pulczinski*, 691 F.3d at 1003 (internal quotation marks and citation omitted).

First, Perry has failed to establish that her husband was "disabled" within the meaning of the ADA. While the evidence clearly shows that Perry's husband had a serious medical condition for purposes of the FMLA, "[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment

---

[12]The disability discrimination provisions in the Nebraska Fair Employment Practice Act are patterned after the ADA. "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII and the ADA." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012) (internal quotation marks and citation omitted). Therefore, my analysis of Perry's ADA claim also encompasses her NFEPA claims.

limits a major life activity.  Determining whether a major life activity has been substantially limited is an individualized inquiry." *Brunke v. Goodyear Tire & Rubber Co.*, 344 F.3d 819, 821 (8th Cir. 2003) (internal quotation marks and citations omitted).

In Perry's case, there is no evidence from which an individualized inquiry can be made regarding whether Mr. Perry's medical condition substantially limited him in a major life activity.  The only evidence in that regard is the undisputed evidence that Mr. Perry continued to work at his job with the County, even after receiving his liver transplant in September of 2012, several months after Perry's employment was terminated. (Filing 18-1, Perry Dep. 53:21-24 ("My husband has the tendency to work no matter what.  He worked when he was ill.  After he had the liver transplant, he went to work and he was sick."); Filing 18-2, Perry Dep. 245:14-246:8.)  Thus, with respect to the major life activity of working, the only evidence in the record indicates that Mr. Perry's medical condition did not substantially limit him.

Second, "[i]f an employer, in explaining a termination, says it believed that the employee violated company rules, . . . the employee must show the employer did not truly believe that the employee violated company rules" in order to prove that the employer's explanation for termination was false.  *Pulczinski*, 691 F.3d at 1003.  "A showing that the employer made a mistaken and unreasonable determination that an employee violated company rules does not prove that the employer was motivated by a known disability.  Even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist."  *Id*. (internal quotation marks, alterations, and citations omitted).

Here, the County's proffered reasons for terminating Perry's employment were  the events on January 5, 2012, and Perry's history of security-related issues.  YSC Director Schindler understood from the facts given to her after an internal investigation that Perry had engaged in multiple activities that raised security concerns on January 5, 2012, and that Perry had previously—and repeatedly—been disciplined for missing security checks and leaving youth unsupervised and unsecured.  (Filing 18-28.)

29

This is sufficient to constitute a "legitimate, nondiscriminatory reason for the employment action." *Pulczinski*, 691 F.3d at 1004. "It is not [my] province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination." *Id*. "This is not a case where the record in support of the employer's conclusion is . . . so sparse, or the employer's conclusion so implausible, that [Perry's] challenge to the merits of the decision can create a genuine issue about whether the employer's motivation was impermissible." *Id*. (internal quotation marks, alterations, and citations omitted).

Because Perry has not shown that Schindler "did not truly believe that [Perry] violated company rules," and, therefore, has not established pretext, *id.*, I shall grant the defendant's motion for summary judgment on Perry's disability claim.

## D.  UNION-MEMBERSHIP CLAIM

Perry's final claim is that the County violated Article XV § 13 of the Nebraska Constitution and Neb. Rev. Stat. § 48-217 by terminating her employment due to her union membership and activity. Assuming for the sake of argument that such claim is even cognizable in this court, particularly because Perry's federal claims have failed, there is no evidence in the record to support such a claim.

First, there is no evidence that Perry was a member of the union or involved in any union activity. Second, there are neither allegations nor evidence that union members were treated differently from non-union members. Finally, the only allegations and evidence contained in the record relative to the union are that Perry and other YSC employees were allegedly denied union representation when they were called into meetings with management staff. (Filing 1-1, Complaint ¶ 9; Filing 18-2, Perry Dep. 246:16-247:10.)  While this may constitute a potential violation of the terms of the labor agreement between the union and the County, it does not establish that union membership was involved in Schindler's decision to terminate Perry's employment.  Therefore, I must grant the County's motion for summary judgment on Perry's union-membership claim.

Accordingly,

30

IT IS ORDERED:

1.      The defendant's motion for summary judgment (Filing 17) is granted on all of the plaintiff's claims;

2.      Judgment in favor of the defendant and against the plaintiff shall be entered by separate document.

DATED this 9th day of June, 2014.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.